**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation,<br><br>Plaintiff-Counterdefendant,<br><br>v.<br><br>DFS SERVICES LLC f/k/a DISCOVER FINANCIAL SERVICES LLC, a Delaware limited liability company,<br><br>Defendant-Counterclaimant. | ) | Case No.: 08-CV-2191<br><br>Judge George W. Lindberg<br>Magistrate Judge Jeffrey Cole |

**DEFENDANT-COUNTERCLAIMANT DFS SERVICE LLC'S ANSWER, AFFIRMATIVE DEFENSE AND COUNTERCLAIM TO PLAINTIFF-COUNTERDEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA'S COMPLAINT**

Defendant-Counterclaimant DFS Services LLC f/k/a Discover Financial Services LLC ("DFS"), by and through its counsel, for its answer, affirmative defense and counterclaim to Plaintiff-Counterdefendant National Union Fire Insurance Company of Pittsburgh, PA's ("National Union") Complaint for Declaratory Judgment, states as follows:

**Nature of Action**

1. This is an action for declaratory judgment, brought pursuant to 28 U.S.C. §§ 2201 and 2202, wherein National Union seeks a declaration regarding its duties and obligations under certain umbrella liability insurance policies (collectively, the "Umbrella Policies") issued out of, and produced in, New York to Morgan Stanley and/or Discover Financial, Inc. as respects the patent infringement lawsuit entitled *NextCard, LLC v. American Express Company*, *et al.*, Civil Action No. 2:07-cv-00354-TJW, filed in the United States District Court for the Eastern District of Texas, Marshall Division (hereinafter the "NextCard Action").

**ANSWER:** DFS admits that this is a claim by National Union for declaratory judgment regarding its duties and obligations under certain commercial umbrella insurance

policies issued to Morgan Stanley Dean Witter by National Union as its respects the NextCard Action. DFS denies the remaining allegations of paragraph 1.

2. Defendant DFS Services LLC (f/k/a Discover Financial Services, LLC) ("DFS") seeks coverage with respect to the claims asserted in the NextCard Action. National Union, in contrast, contends that the claims asserted in the NextCard Action do not implicate coverage under National Union's insurance policies.

**ANSWER:** Admitted.

3. Accordingly, a real, substantial and justifiable controversy has arisen and now exists between National Union, on the one hand, and DFS, on the other, which controversy is subject to resolution by this Court under 28 U.S.C. §§ 2201 and 2202.

**ANSWER:** Admitted.

## Parties

4. Plaintiff National Union is a corporation organized under the laws of the state of Pennsylvania with its principal place of business in New York, New York.

**ANSWER:** Admitted.

5. Upon information and belief, Defendant DFS is a Delaware limited liability company with its principal place of business in Riverwoods, Illinois.

**ANSWER:** Admitted.

## Jurisdiction and Venue

6. Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332(a)(1), because the Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:** Admitted.

7.    DFS is subject to this Court's personal jurisdiction because it does and has done substantial business in this judicial district and derives substantial revenue from services provided to individuals in this State and in this District.

**ANSWER:**    DFS admits that it is subject to this Court's personal jurisdiction.   DFS denies the remaining allegations of paragraph 7.

8.    Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a)(1) and (c).

**ANSWER:**    DFS admits that venue in this District is proper under 28 U.S.C. § 1391. DFS denies the remaining allegations of paragraph 8.

**Factual Background**

9.    NextCard, LLC ("NextCard") initiated the NextCard Action on or about August 16, 2007, at which time NextCard filed suit against Discover Financial Services, LLC and others for their alleged infringement of certain patents in which NextCard purportedly has interest.  National Union attaches a true and correct copy of the original Complaint for Patent Infringement (the "NextCard Complaint") as Exhibit "A" of its Complaint.

**ANSWER:**    Admitted.

10.    The NextCard Complaint alleges that Discover Financial Services, LLC and others infringed the following four U.S. Patents:  No. 6,405,181 ("Method and Apparatus for Real Time On Line Credit Approval") (the "'181 Patent"); No. 6,567,791 ("Method and Apparatus for a Verifiable On Line Rejection of an Application for Credit") (the "'791 Patent"); No. 7,143,063 ("Method and Apparatus for a Verifiable On Line Rejection of an Applicant for Credit") (the "'063 Patent"); and No. 6,718313 ("Integrating Live Chat Into an Online Credit Card Application") (the "'313 Patent") (collectively, the "NextCard Patents-in-Suit").

**ANSWER:**    Admitted.

11.    NextCard alleges that Discover Financial Services, LLC and its co-defendants have willfully and deliberately infringed one or more of NextCard's patents by,

among other things: offering credit to consumers via applications that are transmitted over the internet for real-time approval in accordance with the methods and systems claims by the '181 Patent; by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '791 Patent; by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '063 Patent; and by incorporating on-line chat features into their internet credit card offerings/applications in accordance with the methods and systems claimed by the '313 Patent.

**ANSWER:** DFS admits that the allegations in paragraph 11 are part of the allegations set forth in the NextCard Complaint. DFS denies any characterization of the NextCard Complaint that is inconsistent with the actual allegations of the NextCard Complaint.

12. The NextCard Complaint asserts the following causes of action: Count I - Infringement of U.S. Patent 6,405,181; Count II - Infringement of U.S. Patent 6,567,791; Count III - Infringement of U.S. Patent 7,143,063; and Count IV - Infringement of U.S. Patent 6,718,313.

**ANSWER:** Admitted.

13. The NextCard Complaint seeks injunctive relief, an award of costs of suit and attorneys' fees, an award of damages, and such other further relief as justice requires.

**ANSWER:** DFS admits that the allegations contained in paragraph 11 is some of the relief sought by NextCard in the NextCard Complaint. DFS denies any characterization of the NextCard Action contained in paragraph 13 that is inconsistent with the actual allegations of the NextCard Complaint.

14. On or about November 15, 2007, NextCard filed a First Amended Complaint in the NextCard Action (the "NextCard Amended Complaint"). The factual and legal allegations in the NextCard Amended Complaint are substantially similar to those contained in the NextCard Complaint. However, the NextCard Amended Complaint names among its defendants "DFS Services LLC (f/k/a Discover

Financial Services, LLC)." National Union attaches a true and correct copy of the NextCard Amended Complaint (without exhibits) as Exhibit "B" of its Complaint.

**ANSWER:** DFS admits the allegations of paragraph 14 except that it denies that the legal allegations are substantially similar in that NextCard dropped its willful infringement allegations from its amended complaint.

15. DFS has tendered the NextCard Action to National Union and seeks defense and indemnity in the action under the Umbrella Policies' "Advertising Injury" and/or "Personal Injury and Advertising Injury" coverage.

**ANSWER:** Admitted.

16. National Union has denied coverage to DFS for the NextCard Action as it does not involve or potentially involve damages for "Advertising Injury" or "Personal Injury and Advertising Injury" caused by an "Occurrence," and/or is otherwise excluded from coverage.

**ANSWER:** DFS admits that National Union has denied coverage to DFS for the NextCard Action. DFS denies the remaining allegations of paragraph 16.

17. Accordingly, a real, substantial and justifiable controversy has arisen and now exists between National Union, on the one hand, and DFS, on the other, which controversy is subject to resolution by this Court under 28 U.S.C. §§ 2201 and 2202.

**ANSWER:** Admitted.

## The Insurance Contracts

### The 1998-05 Umbrella Policies

18. National Union issued the following commercial umbrella policies: Policy No. BE 3578880 for the policy period effective October 1, 1998 to October 1, 2001, and extended to October 1, 2002 by endorsement (the "1998-02 Umbrella

Policy"); Policy No. BE 2195452 for the policy period effective October 1, 2002 to October 1, 2003 (the "2002-03 Umbrella Policy"); Policy No. BE 2977817 for the policy period effective October 1, 2003 to October 1, 2004 (the "2003-04 Umbrella Policy"); and Policy No. 2978252 for the policy period effective October 1, 2004 to October 1, 2005 (the "2004-05 Umbrella Policy") (collectively, the "1998-05 Umbrella Policies"). National Union attaches copies of the 1998-05 Umbrella Policies as Group Exhibit "C" to this Complaint.

**ANSWER:** Admitted.

19. The 1998-05 Umbrella Policies include the following provisions:

**Insuring Agreements**

**I. Coverage**

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

* * *

**II Defense**

**A.** We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:

**1.** The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by payment of claims to which this policy applies; or

**2.** Damages are sought for **Bodily Injury, Property Damage,**

**Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

**ANSWER:** DFS admits the 1998-05 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 19 that are inconsistent with the provisions of the policies.

20. Section III, provision E of the Insuring Agreement in the 1998-05 Umbrella Policies contains the following provisions regarding the "Retained Limit";

**E. Retained Limit**

We will be liable only for that portion of damages in excess of the **Insured's** Retained Limit which is defined as the greater of either:

**1.** The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the **Insured**; or

**2.** The amount stated in the Declarations of Self Insured Retention as a result of any one **Occurrence** not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying insurance providing coverage to the **Insured**;

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

**ANSWER:** DFS admits the 1998-05 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS

denies any characterizations of the policies contained in paragraph 20 that are inconsistent with the provisions of the policies.

21. The 1998-05 Umbrella Policies contain the following definitions:

**A.** **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses:

**1.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**2.** Oral or written publication of material that violates a person's right of privacy;

**3.** Misappropriation of advertising ideas or style of doing business; or

**4.** Infringement of copyright, title or slogan.

* * *

**H.** **Occurrence** means:

* * *

**3.** As respects **Advertising Injury**, an offense committed in the course of advertising your goods, products and services that results in **Advertising injury**. All damages that arise from the same or related injurious material or act shall be considered as arising out of one **Occurrence,** regardless of the frequency or repetition there of, the number and kind of media used and the number of claimants.

**ANSWER:** DFS admits the 1998-05 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 21 that are inconsistent with the provisions of the policies.

22. The 1998-05 Umbrella Policies contain the following exclusions:

The insurance does not apply to …

**K.** **Personal Injury** or **Advertising Injury:**

**1.** Arising out of oral or written publication of material, if done by or at the direction of the **Insured** with knowledge of its falsity;

**2.** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

* * *

**R.** **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of or by reason of:

**1.** The purchase, sale, offer of sale, or solicitation of any security, debt, bank deposit or financial interest or instrument …

**ANSWER:** DFS admits the National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 22 that are inconsistent with the provisions of the policies.

**The 2005-06 Umbrella Policy**

23. National Union issued Commercial Umbrella Policy No. BE 4484949, effective from October 1, 2005 to October 1, 2006 ("the 2005-06 Umbrella Policy"). National Union attaches a copy of the 2005-06 Umbrella Policy as Exhibit "D" to this Complaint.

**ANSWER:** Admitted.

24. The 2005-06 Umbrella Policy includes the following provisions:

**Insuring Agreements**

**I. Coverage**

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of the **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

If we are prevented by law or statute from paying on behalf of the **Insured,** then we will, where permitted by law or statute, indemnify the **Insured** for those sums in excess of the Retained Limit.

* * *

**II. Defense**

**A.** We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:

**1.** The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by payment of claims to which this policy applies; or

**2.** Damages are sought for **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

* * *

**III. Limits of Insurance**

* * *

**E. Retained Limit**

We will be liable only for that portion of damages in excess of the **Insured's** Retained Limit which is defined as the greater of either:

**1.** The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the **Insured**; or

**2.** The amount stated in the Declarations as Self Insured Retention as a result of any one **Occurrence** not covered by the underlying policies listed in the Schedule of Underlying Insurance nor any other underlying insurance providing coverage to the **Insured**;

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

* * *

**ANSWER:** DFS admits the 2005-06 National Union policy contains the above-stated language. However, this language must be considered in the context of the entire policy. DFS denies any characterization of the policy contained in paragraph 24 that is inconsistent with the provisions of the policy.

25. The 2005-06 Umbrella Policy contains the following definitions:

**Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For purposes of this definition:

**1.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**2.** Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.[1]

**A.** **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses;

**1.** Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**2.** Oral or written publication of material that violates a person's right of privacy;

**3.** The use of another's advertising idea in your **Advertisement**; or

**4.** Infringement upon another's copyright, trade dress or slogan in your **Advertisement**.[2]

* * *

**H.** **Occurrence** means:

* * *

**3.** As respects **Advertising Injury**, an offense committed in the course of advertising your goods, products and services that results in **Advertising Injury**. All damages that arise from the same or related injurious material or act shall be considered as arising out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

**ANSWER:** DFS admits the 2005-06 National Union policy contains the above-stated language. However, this language must be considered in the context of the entire policy. DFS

[1] Definition added by the Endorsement No. 11, entitled "Miscellaneous Changes Endorsement."

[2] As amended by Endorsement No. 11, entitled "Miscellaneous Changes Endorsement."

denies any characterization of the policy contained in paragraph 25 that is inconsistent with the provisions of the policy.

26. The 2005-06 Umbrella Policy contains the following exclusions:

This insurance does not apply to …

**K.** **Personal injury** or **Advertising Injury**:

**1.** Arising out of oral or written publication of material, if done by or at the direction of the **Insured** with knowledge of its falsity;

**2.** Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

* * *

**R.** **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of or by reason of:

**1.** The purchase, sale, offer of sale or solicitation of any security, debt, bank deposit or financial interest or instrument …

* * *

**Personal Injury** or **Advertising Injury** arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your **Advertisement,** of copyright, trade dress or slogan.[3]

* * *

**ANSWER:** DFS admits the 2005-06 National Union policy contains the above-stated language. However, this language must be considered in the context of the entire policy. DFS

[3] Exclusion added by Endorsement No. 11, entitled "Miscellaneous Changes Endorsement."

denies any characterization of the policy contained in paragraph 26 that is inconsistent with the provisions of the policy.

**The 2006-08 Umbrella Policies**

27. National Union also issued Commercial Umbrella Policy No. BE 4485685, effective from October 1, 2006 to October 1, 2007, and Commercial Umbrella Policy No. 9835053, effective June 30, 2007 to June 30, 2008 (collectively "the 2006-08 Umbrella Policies"). National Union attaches copies of the 2006-08 Umbrella Policies as Group Exhibit "E" to this Complaint.

**ANSWER:** Admitted.

28. The 2006-08 Umbrella Policies include the following provisions:

**I. INSURING AGREEMENT – COMMERCIAL UMBRELLA LIABILITY**

A. We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract.**

The amount we will pay for damages is limited as described in Section IV Limits of Insurance.

B. This policy applies, only if:

1. the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**; and

2. the **Personal Injury and Advertising Injury** is caused by the **Occurrence** that

takes place anywhere arising out of your business, but only if the **Occurrence** was committed during the **Policy Period.**

* * *

**III. DEFENSE PROVISIONS**

A. We will have the right and duty to defend any **Suit** against the **Insured** that seeks damages for **Bodily Injury, Property Damage** or **Personal Injury** covered by this policy, even if the **Suit** is groundless, false or fraudulent when:

1. the total applicable limits of **Scheduled Underlying Insurance** have been exhausted by payment of **Loss** to which this policy applies and the total applicable limits of **Other Insurance** have been exhausted; or[4]

2. the damages sought because of **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** would not be covered by **Scheduled Underlying Insurance** or any applicable **Other Insurance,** even if the total applicable limits of either the **Scheduled Underlying Insurance** or any applicable **Other Insurance** had not been exhausted by the payment of **Loss** …

B. We will have no duty to defend the **Insured** against any **Suit** seeking damages for **Bodily Injury, Property Damage** or **Personal Injury and Advertising Injury** to which this insurance does not apply.

* * *

**IV. LIMITS OF INSURANCE**

* * *

M. We will not make any payment under this policy unless and until:

1. the total applicable limits of **Scheduled Underlying Insurance** and any applicable

[4] As amended by Endorsement No. 5, entitled "Miscellaneous Changes Endorsement."

**Other Insurance** have been exhausted by the payment of **Loss** to which this policy applies; and

2. the total applicable **Self-Insured Retention** has been satisfied by the payment of **Loss** to which this policy applies.

**ANSWER:** DFS admits the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 28 that are inconsistent with the provisions of the policies.

29. The 2006-08 Umbrella Policies contain the following definitions:

A. **Advertisement** mean a notice that is broadcast of published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

1. notices that are published include material placed on the Internet or on similar electronic means of communication; and

2. regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

* * *

S. **Occurrence** means:

* * *

2. as respects **Personal Injury and Advertising Injury**, an offense arising out of your business that causes **Personal Injury and Advertising Injury.** All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

*   *   *

U.    **Personal Injury and Advertising Injury** means injury arising out of your business, including consequential **Bodily Injury**, arising out of one or more of the following offenses:

1.    false arrest, detention or imprisonment;

2.    malicious prosecution;

3.    the wrongful eviction from, wrongful entry into, or invasion of the right of privacy occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

4.    oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services;

5.    oral or written publication, in any manner, of material that violates a person's right of privacy;

6.    the use of another's advertising idea in your **Advertisement**; or

7.    infringement upon another's copyright, trade dress or slogan in your **Advertisement**.

*   *   *

Z.    **Retained Limit** means:

1.    the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the **Insured**; or

2.    the **Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying Insurance** nor any applicable **Other Insurance** providing coverage to the **Insured**.

**ANSWER:**    DFS admits the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  DFS

denies any characterizations of the policies contained in paragraph 29 that are inconsistent with the provisions of the policies.

30. The 2006-08 Umbrella Policies contain the following exclusions:

This insurance does not apply to …

* * *

L. **Infringement of Copyright, Patent, Trademark or Trade Secret**

This insurance does not apply to **Personal Injury and Advertising Injury** arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your **Advertisement**, of copyright, trade dress or slogan.

* * *

S. **Securities**

This insurance does not apply to any liability arising out of …

2. the purchase, sale, offer of sale or solicitation of any security, debt, insurance policy, bank deposit or financial interest or instrument …

* * *

U. **Various Personal Injury and Advertising Injury**

This insurance does not apply to **Personal Injury and Advertising Injury**:

1. caused by or at the direction of the **Insured** with the knowledge that the act would violate the rights of another and would inflict **Personal Injury and Advertising Injury**;

2. arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any **Insured** with knowledge of its falsity;

3. arising out of oral, written or electronic publication, in any manner, of material whose first publication took place before the beginning of the **Policy Period**;

4. arising out of a criminal act committed by or at the direction of the **Insured** …

**ANSWER:** DFS admits the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 30 that are inconsistent with the provisions of the policies.

* * *

**COUNT I**
**DECLARATORY RELIEF**
**(No Exhaustion of Retained Limit)**

31. National Union re-alleges the allegations of paragraph 1 through 30 above as if fully set forth herein.

**ANSWER:** DFS reincorporates its answers to paragraphs 1-30 of this Answer.

32. The Umbrella Policies are only potentially implicated upon exhaustion of the Retained Limits to which they are excess.

**ANSWER:** DFS admits that the policies' coverage is implicated upon exhaustion of the Retained Limits to which they are excess. DFS denies the remaining allegations of paragraph 32.

33. Coverage is not provided to DFS for the claims asserted in the NextCard Action because DFS has not met its burden of establishing that the Umbrella Policies' respective underlying Retained Limits have been exhausted.

**ANSWER:** Denied.

**COUNT II**

**DECLARATORY RELIEF**

**(No "Advertising Injury" or "Personal Injury and Advertising Injury")**

34. National Union re-alleges the allegations of paragraphs 1 through 33 above as if fully set forth herein.

**ANSWER:** DFS reincorporates its answer to paragraphs 1-33 of this Answer.

35. The NextCard Action does not seek damages for "Advertising Injury" caused by an "Occurrence," as those terms are defined by the 1998-05 and 2005-06 Umbrella Policies (collectively, the "1998-06 Umbrella Policies"). Therefore, the NextCard Action does not implicate the 1998-06 Umbrella Policies' "Advertising Injury" coverage.

**ANSWER:** Denied.

36. The NextCard Action does not seek damages for "Personal Injury and Advertising Injury" caused by an "Occurrence," as those terms are defined by the 2006-08 Umbrella Policies. Therefore, the NextCard Action does not implicate the 2006-08 Umbrella Policies' "Personal Injury and Advertising Injury" coverage.

**ANSWER:** Denied.

**COUNT III**
**DECLARATORY RELIEF**
**(Application of Solicitation of Financial Instrument Exclusion)**

37. National Union re-alleges the allegations of paragraph 1 through 36 above as if fully set forth herein.

**ANSWER:** DFS reincorporates its answers to paragraphs 1-36 above of this Answer.

38.    The NextCard Action's claims against DFS allegedly arise out of the purchase, sale, offer of sale or solicitation of a security, debt, bank deposit, or financial interest or instrument.

**ANSWER:**    Denied.

39.    Exclusion R of the 1998-06 Umbrella Policies excludes coverage for "Advertising Injury" arising out of or by reason of the purchase, sale, offer of sale or solicitation of any security, debt, bank deposit, or financial interest or instrument.

**ANSWER:**    DFS admits Exclusion R of the 1998-06 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  DFS denies any characterizations of the policies contained in paragraph 39 that are inconsistent with the provisions of the policies.

40.    Exclusion S of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" arising out of or by reason of the purchase, sale, offer of sale or solicitation of any security, debt, bank deposit, or financial interest or instrument.

**ANSWER:**    DFS admits Exclusion S of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  DFS denies any characterizations of the policies contained in paragraph 40 that are inconsistent with the provisions of the policies.

41.    To the extent the NextCard Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 1998-06 Umbrella Policies define those terms (which it does not), or "Personal Injury and Advertising Injury" caused by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), coverage is barred for the NextCard Action by Exclusions R and S, respectively.

**ANSWER:**    Denied.

**COUNT IV**
**DECLARATORY RELIEF**
**(Application of Patent Infringement Exclusions)**

42. National Union re-alleges the allegations of paragraphs 1 through 41 above as if fully set forth herein.

**ANSWER:** DFS reincorporates its answers to paragraphs 1-42 of this Answer.

43. The claims alleged in the NextCard Action arise out of the alleged infringement of the NextCard Patents-in-Suit.

**ANSWER:** Admitted.

44. The 2005-06 Umbrella Policy excludes coverage for "Advertising Injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

**ANSWER:** DFS admits the 2005-06 policy contains the above-stated language. However, this language must be considered in the context of the entire policy. DFS denies any characterization of the policy contained in paragraph 44 that is inconsistent with the provisions of the policy.

45. Exclusion L of the 2006-08 Umbrella Policies ("Infringement of Copyright, Patent, Trademark or Trade Secret" exclusion) excludes coverage for "Personal Injury and Advertising Injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

**ANSWER:** DFS admits Exclusion L of the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 45 that are inconsistent with the provisions of the policies.

46. To the extent that the NextCard Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 2005-06 Umbrella Policy defines that term (which it does not), or "Personal Injury and Advertising Injury" caused by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), coverage is barred for the NextCard Action by the above Patent Infringement exclusions.

**ANSWER:** Denied.

**COUNT V**
**DECLARATORY RELIEF**
**(Application of Additional Personal Injury and Advertising Injury Exclusions)**

47. National Union re-alleges the allegations of paragraphs 1 through 46 above as if fully set forth herein.

**ANSWER:** DFS reincorporates its answers to paragraphs 1-46 of this Answer.

48. DFS is alleged to have infringed, and/or to continue to infringe, the NextCard Patents-in-Suit.

**ANSWER:** Admitted.

49. Exclusion K(1) of the 1998-06 Umbrella Policies excludes coverage for "Advertising Injury" arising out of oral or written publication of material, if done by or at the direction of the "Insured" with knowledge of its falsity.

**ANSWER:** DFS admits Exclusion K(1) of the 1998-06 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 49 that are inconsistent with the provisions of the policies.

50. Exclusion U.1. of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" caused by or at the direction of the Insured with

the knowledge that the act would violate the rights of another and would inflict Personal Injury and Advertising Injury.

**ANSWER:**    DFS admits Exclusion U.1 of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  DFS denies any characterizations of the policies contained in paragraph 50 that are inconsistent with the provisions of the policies.

51.    Exclusion U.2. of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" arising out of oral, written or electronic publication, in any manner, of material if done by or at the direction of any Insured with knowledge of its falsity.

**ANSWER:**    DFS admits Exclusion U.2 of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  DFS denies any characterizations of the policies contained in paragraph 51 that are inconsistent with the provisions of the policies.

52.    Exclusion U.4. of the 2006-08 Umbrella Policies excludes coverage for Personal Injury and Advertising Injury" arising out of a criminal act committed by or at the direction of the Insured.

**ANSWER:**    DFS admits Exclusion U.4 of the 2006-08 National Union policies contain the above-stated language.  However, this language must be considered in the context of the entire policies.  DFS denies any characterizations of the policies contained in paragraph 52 that are inconsistent with the provisions of the policies.

53.    Upon information and belief DFS first used its allegedly infringing technology prior to the inception of one or more of the Umbrella Policies.

**ANSWER:**    Denied.

> 54. Exclusion K(2) of the 1998-06 Umbrella Policies excludes coverage for "Advertising Injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**ANSWER:** DFS admits Exclusion K(2) of the 1998-06 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 54 that are inconsistent with the provisions of the policies.

> 55. Exclusion U.3. of the 2006-08 Umbrella Policies excludes coverage for "Personal Injury and Advertising Injury" arising out of oral, written or electronic publication, in any manner, of material whose first publication took place before the beginning of the Policy Period.

**ANSWER:** DFS admits Exclusion U.3 of the 2006-08 National Union policies contain the above-stated language. However, this language must be considered in the context of the entire policies. DFS denies any characterizations of the policies contained in paragraph 55 that are inconsistent with the provisions of the policies.

> 56. To the extent the NextCard Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 1998-06 Umbrella Policies define those terms (which it does not), or "Personal Injury and Advertising Injury" cause by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), coverage is barred for the NextCard Action by Exclusions K(1) and/or (2) of the 1998-06 Umbrella Policies, and by Exclusions U(1), (2), (3) and/or (4) of the 2006-08 Umbrella Policies.

**ANSWER:** Denied.

**COUNT VI**
**DECLARATORY RELIEF**
**(No Coverage for Damages Outside of Policy Period)**

57. National Union re-alleges the allegations of paragraph 1 through 56 above as if fully set forth herein.

**ANSWER:** DFS reincorporates its answers to paragraphs 1-57 of this Answer.

58. In the alternative, to the extent the NextCard Action is construed as seeking damages for "Advertising Injury" caused by an "Occurrence," as the 1998-06 Umbrella Policies define those terms (which it does not), the 1998-06 Umbrella Policies do not cover liability for damages because of "Advertising Injury" that takes place outside of their respective policy periods.

**ANSWER:** Denied.

59. In the alternative, to the extent the NextCard Action is construed as seeking damages for "Personal Injury and Advertising Injury" caused by an "Occurrence," as the 2006-08 Umbrella Policies define those terms (which it does not), the 2006-08 Umbrella Policies do not cover liability for damages because of "Personal Injury and Advertising Injury" that was caused by an "Occurrence" committed outside of their respective policy periods.

**ANSWER:** Denied.

**Affirmative Defense**

Pursuant to the seminal case of *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 150-51, 708 N.E.2d 1122, 1134-35 (Ill. 1999) and its progeny, National Union is estopped from raising policy defenses under the various National Union policies because of its improper handling of DFS's request for coverage for the NextCard Action.

WHEREFORE, DFS hereby requests that this Court enter judgment in its favor and against National Union and award DFS such other and further relief as this Court deems just and proper, including awarding DFS its attorneys' fees and costs.

**COUNTERCLAIM FOR DECLARATORY**
**JUDGMENT AND BREACH OF CONTRACT**

Counterclaimant DFS Services LLC ("DFS"), by its attorneys, complains of counterdefendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and states as follows:

**NATURE OF ACTION**

1. This is an action by DFS, as an insured under a National Union insurance policy, against National Union for declaratory judgment and breach of contract. A controversy exists between DFS and National Union over whether National Union had a duty to defend and indemnify DFS in a lawsuit styled as *NextCard, LLC v. American Express, et al.*, formerly pending in the United States District Court for the Eastern District of Texas, Case No. 2:07-CV-354 (TJW) (the "NextCard Action"). The NextCard Action alleged, among other things, that DFS's offering of credit to applicants via its online credit card system infringed five NextCard patents, several of which, according to NextCard, covers patented advertising ideas or a patented style of doing business. Consequently, the NextCard Action triggered "advertising injury" coverage under the National Union Policy and required National Union to defend DFS. National Union's refusal to do so constituted abandonment of DFS and left DFS to fend for itself in the NextCard Action, which DFS ultimately settled without any assistance from National Union. DFS, therefore, seeks a declaratory judgment that National Union was required to defend and indemnify DFS in the NextCard Action. DFS also seeks damages for National Union's breach of its contractual agreement to defend and indemnify DFS in the NextCard Action.

**JURISDICITON AND VENUE**

2. Counterclaimant DFS Services LLC is a limited liability corporation with its sole member being Discover Financial Services, a publicly traded Delaware corporation with its principal place of business in Riverwoods, Illinois.

3. Counterdefendant National Union Insurance Company of Pittsburgh, PA is a Pennsylvania corporation with its principal place of business in New York, New York.

4. This is an action for breach of contract and declaratory relief pursuant to 28 U.S.C. § 2201. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists between the parties, and the amount in controversy exceeds the sum of $75,000, exclusive of interest.

5. This Court has personal jurisdiction over National Union because National Union actively sells insurance policies in the State of Illinois, including the Northern District, and is licensed to do business in the State of Illinois.

6. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a) and (c) in that DFS resides in the Northern District, the insured risk is substantially in the Northern District of Illinois, and substantial parts of the events giving rise to this claim occurred within this judicial district, including DFS's advertising systems, which are primarily located in and controlled from Riverwoods, Illinois. The "advertising injury" coverage at issue looks to the location from which the advertising conduct of the insured emanates.

**FACTS**

**National Union's Umbrella Insurance Policy**

7. National Union issued its policy No. BE 357-88-80 as a renewal of BE 357-12-60, effective October 1, 1998, through October 1, 2001, and extended by endorsement through

October 1, 2002 (the "Policy"). A true and correct copy of the Policy is attached hereto as Exhibit 1.

8. Under the Policy, Morgan Stanley Dean Witter & Co. is the named insured, with coverage extended to DFS, which at that time was a wholly owned subsidiary of Morgan Stanley. (*See* Ex. 1 § IV(E)(1)(a)).

9. The Policy provides, *inter alia*, the following coverage for "advertising injury" claims:

**Insuring Agreements**

**1. Coverage.**

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of . . . **Advertising Injury** that takes place during the Policy Period and is caused by an **occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

. . . .

**II. Defense.**

**A.** We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when . . . (2) damages are sought for . . . **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured**.

**B.** When we assume the defense of any claim or suit: (1) we will defend any suit against the **Insured** seeking damages on account of . . . **Advertising Injury** even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle a claim as we deem expedient.

. . . .

**IV. Definitions.**

**A. Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses: . . . (3) **misappropriation of advertising ideas** or **style of doing business** . . . .
. . . .

**H. Occurrence** means: . . . (3) as respects **advertising injury**, an offense committed in the course of advertising your goods, products or services that results in **Advertising Injury**.

(Ex. 1 at 1, 3 and 5.)

**Background Regarding The Underlying NextCard Action**

10. On August 16, 2007, NextCard filed its original complaint against DFS. A true and correct copy of the original complaint is attached hereto as Exhibit 2.

11. On November 19, 2007, NextCard filed its First Amended Complaint in the NextCard Action (the "First Amended Complaint"). A true and correct copy of the Amended Complaint is attached hereto as Exhibit 3.

12. On April 9, 2008, NextCard filed its Second Amended Complaint in the NextCard Action (the "Second Amended Complaint"). A true and correct copy of the Second Amended Complaint is attached hereto as Exhibit 4.

13. All three versions of NextCard's complaint allege, in pertinent part, that Plaintiff NextCard is the sole holder of the right, title, and interest in the following United States patents: No. 6,405,181 (titled "Method and Apparatus for Real Time On Line Credit Approval"); No. 6,567,791 (titled "Method and Apparatus for a Verifiable On Line Rejection of an Application for Credit"); No. 7,143,063 (titled "Method and Apparatus for a Verifiable On Line Rejection of an Applicant for Credit"); and No. 6,718,313 ("Integrating Live Chat Into an Online Credit Card Application"). (Exs. 2-4, ¶ 1.) In the Second Amended Complaint, NextCard added a fifth

patent, U.S. Patent No. 7,346,576 (Integrating Live Chat Into an Online Credit Card Application"). (All five patents are hereinafter the "Patents In Suit").

14. The complaints further alleged, in pertinent part, that DFS "has infringed and continues to infringe the '181 Patent by *offering credit to consumers* via applications that are transmitted over the internet for real-time approval in accordance with the methods and systems claimed in the '181 patent." (*Id.* ¶ 13) (emphasis added).

15. Numerous of the specification descriptions in the preferred embodiment of the '181 Patent claim the invention of an "advertising activity" or "style of doing business" as those terms are used in the insurance policy National Union issued to DFS. For example:

a. "[A] process for providing a set of multiple *offers* to an applicant and receiving a balance transfer amount corresponding to an *offer* selected by the application" (Ex. 4, Tab A at Col. 3:11-14; Col. 13:21-24) (emphasis added);

b. "[A] display provided to the applicant for the purpose of presenting *multiple offers* to the applicant" (*id*. at Col. 3:26-28) (emphasis added);

c. "[A] set of *offers* is derived from the credit report data and other application information stored in the application object … the set of offers is displayed" (*id*. at Col. 13-46-49) (emphasis added);

d. "Both the credit limit *offered* to the applicant and the interest rate *offered* to the applicant may vary according to the amount of the total revolving balance that the applicant chooses to transfer to the new account" (*id*. at Col. 13:56-60) (emphasis added);

e. "*[O]ffers* may present incentives such as frequent flier miles, cash back on purchases, or favorable interest rates" (*id*. at Col. 13:61-63) (emphasis added);

f. "Thus, the system derives a set of *offers* based on information from the applicant's credit reports and displays the set of *offers* to the applicant. The applicant then can select an *offer* based on the amount of balance transfer that the applicant wishes to make" (*id*. at Col. 14:5-13) (emphasis added);

g. "[A] display provided to the application for the purpose of presenting multiple *offers* to the applicant. This display includes a first *offer*, a

second *offer*, a third *offer*, and a fourth *offer*. For each *offer*, there is a column corresponding to the initial teaser rate, a column corresponding to the required limit, and a column corresponding to the required balance transfer for that *offer* to be accepted. The applicant selects one of the *offers* from the table" (*id*. at Col. 15:66-67) (emphasis added);

h. "[I]n one embodiment, the *offers* are provided as part of a web page and the *offers* are presented using html. By selecting an *offer*, the applicant selects a link that indicates to the system which *offer* is selected. Once an *offer* is selected, the process of acquiring the required balance transfer in real-time from the applicant is executed" (*id*. at Col. 16:1-14) (emphasis added); and

i. "[T]he applicant is returned to the *offer* selection screen so that the applicant will have an opportunity to select another *offer* that either does not require a balance transfer or requires less of a balance transfer" (*id*. at Col. 16:66-68; Col. 17:1-2) (emphasis added).

**<u>National Union's Duties To Defend And Indemnify DFS</u>**

16. The Policy requires that National Union defend DFS where a claim or suit against DFS alleges facts potentially constituting an advertising injury that arises solely out of DFS's advertising activities, provided that such advertising activities allegedly involve the misappropriation of another's advertising ideas or style of doing business, and provided further that the advertising injury is not covered by any underlying insurance.

17. Here, one or more of the Patents In Suit reflect a claimed advertising idea or style of doing business. Moreover, both the original and amended complaints alleged that DFS, by offering credit to applicants via its online credit card system, misappropriated (*i.e.*, unlawfully infringed) one or more of these patented ideas or styles. The complaints further alleged facts that constitute advertising injury to NextCard because at least some of the Patents In Suit can be infringed only by advertising activity. It is apparent, therefore, from the NextCard complaints that NextCard contended that DFS's online credit card system infringed various Patents In Suit because such system advertise DFS products and services via the automated online credit card system.

18. The alleged advertising injury is not covered by any underlying insurance available to DFS.

19. Under the foregoing circumstances, National Union has a duty to defend and to indemnify DFS in the NextCard Action.

20. Moreover, the Policy requires that National Union indemnify DFS for sums DFS pays in excess of its Retained Limit as a result of an advertising injury caused by occurrence that is not covered by underlying insurance. (Ex. 1 at 1).

21. DFS settlement of the NextCard Action falls within this coverage and National Union is required to indemnify DFS for the settlement.

**National Union's Breach Of Its Duties**

22. DFS tendered the NextCard Action to its primary insurer, Liberty Mutual Insurance Company, which refused to defend DFS. DFS subsequently tendered the NextCard Action to National Union and requested that National Union defend the NextCard Action.

23. National Union refused to defend DFS in the NextCard Action. Abandoned by National Union, DFS defended itself in the NextCard Action, and ultimately settled the matter.

24. DFS has complied with all of its obligations under the Policy.

**COUNT I**
**DECLARATORY JUDGMENT**

25. DFS incorporates by this reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully realleged here.

26. An actual controversy exists between the parties. This Court has jurisdiction to enter a declaratory judgment concerning the respective rights and duties of the parties.

27. National Union breached its duty to defend and indemnify DFS in the NextCard Action. Moreover, despite DFS's request for defense and indemnity coverage, National Union abandoned DFS and left DFS to fend for itself in the NextCard Action.

28. It is necessary and proper under the circumstances alleged herein that this Court adjudicate and declare that National Union: (a) had a duty to defend and indemnify DFS under the Policy for the NextCard Action; (b) breached its duty to defend and indemnify DFS in the NextCard Action; (c) had a duty to pay for DFS's retained counsel, which defended DFS against the claims made by NextCard; and (d) is estopped from asserting any defenses to DFS's claim that National Union is obligated to defend and indemnify DFS in the NextCard Action.

WHEREFORE, DFS respectfully requests that this Court enter a declaration that:

(1) National Union had a duty to defend and indemnify DFS under the Policy for the NextCard Action;

(2) National Union breached its duty to defend and indemnify DFS in the NextCard Action;

(3) National Union is estopped from asserting policy defenses to defending and indemnifying the NextCard Action;

(4) National Union had a duty to pay for DFS's retained counsel, which defended DFS against the claims made by NextCard; and

(5) grant such other and further relief as the Court deems proper under the evidence and circumstances.

**COUNT II**
**BREACH OF CONTRACT**

29. DFS incorporates by this reference each and every allegation set forth in the preceding paragraphs of this Complaint as though fully realleged here.

30.     National Union owed DFS a duty of defense and indemnity in the NextCard Action under the Policy.

31.     National Union breached its duty to defend and indemnify DFS in the NextCard Action.

32.     As a direct and proximate result of the breach of contract by National Union, DFS suffered damages in the form of defense and settlement costs and other related expenses.

WHEREFORE, DFS respectfully requests that this Court:

(1)     enter judgment for DFS and against National Union in an amount of compensatory damages proximately caused by National Union's breach of contract;

(2)     award DFS prejudgment interest and attorneys fees pursuant to Illinois statute; and

(3)     grant such other and further relief as the Court deems proper under the evidence and circumstances.

Respectfully submitted,
DFS SERVICES LLC f/k/a DISCOVER
FINANCIAL SERVICES LLC

By:  /s/  Kimball R. Anderson

Kimball R. Anderson
Samuel Mendenhall
Giel Stein
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(Tel): (312) 558-5600
(Fax): (312) 558-5700
kanderson@winston.com
smendenhall@winston.com
gstein@winston.com

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on June 30, 2008, I electronically filed the foregoing DFS SERVICES LLC'S ANSWER, AFFIRMATIVE DEFENSE AND COUNTERCLAIM TO NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PA'S COMPLAINT FOR DECLARATORY JUDGMENT with the Clerk of the Court for the Northern District of Illinois using the ECF System, which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:

Richard H. Nicolaides, Jr.
Matthew J. Fink
Daniel I. Graham, Jr.
Bates & Carey LLP
191 North Wacker Drive
Suite 2400
Chicago, Illinois 60606

/s/ Samuel Mendenhall

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation, | ) | |
| Plaintiff-Counterdefendant, | ) | Case No.: 08-CV-2191 |
| v. | ) | Judge George W. Lindberg<br>Magistrate Judge Jeffrey Cole |
| DFS SERVICES LLC f/k/a DISCOVER FINANCIAL SERVICES LLC, a Delaware limited liability company, | ) | |
| Defendant-Counterclaimant. | ) | |

**<u>EXHIBIT INDEX</u>**

Exhibit 1: National Union Insurance Policy 1998-2002.

Exhibit 2: NextCard LLC's August 16, 2007, Complaint.

Exhibit 3: NextCard LLC's November 19, 2007, First Amended Complaint.

Exhibit 4: NextCard LLC's April 9, 2008, Second Amended Complaint.

Tab A: United States patent No. 6,405,181.

# EXHIBIT 1



# COMMERCIAL UMBRELLA DECLARATIONS

## NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

A CAPITAL STOCK Company

ADMINISTRATIVE OFFICES
70 PINE STREET, NEW YORK, NEW YORK 10270-0150

POLICY NUMBER: BE 357 88 80

RENEWAL OF: BE 357 12 60

PRODUCER NAME: MARSH & MCLENNAN GLOBAL BROKING
ADDRESS: 1166 AVENUE OF THE AMERICAS
NEW YORK NY 10036-0000

ITEM 1. NAMED INSURED: MORGAN STANLEY DEAN WITTER & CO.
ADDRESS: 1585 BROADWAY
NEW YORK, NY 10036

ITEM 2. POLICY PERIOD: FROM OCTOBER 01, 1998 TO: OCTOBER 01, 2001 AT 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

ITEM 3. LIMITS OF INSURANCE

The Limits of Insurance, subject to all the terms of this policy, are:

A. $25,000,000 Each Occurrence

B. $25,000,000 General Aggregate ( in accordance with Section III, Limits of Insurance)

C. $25,000,000 Products-Completed Operations Aggregate (in accordance with Section III, Limits of Insurance)

D. $ 10,000 Self Insured Retention

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

ITEM 4. PREMIUM COMPUTATION

| ESTIMATED EXPOSURE | RATE/ PER | ADVANCE PREMIUM | MINIMUM PREMIUM |
|---|---|---|---|
| N/A | FLAT | $277,368 | $277,368 |

ITEM 5. ENDORSEMENTS ATTACHED: SEE ATTACHED SCHEDULE

COUNTERSIGNED ______ DATE ______ BY ______ AUTHORIZED REPRESENTATIVE

MARSH Global Broking Inc.
Received
AUG - 9 1999
Excess Casualty

57696 (6/93)

 

ENDORSEMENT #0011

This endorsement, effective 12:01 a.m. 10/01/00 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## EXTENSION ENDORSEMENT

In consideration of an additional premium of $119,700, it is agreed that the expiration date of this policy is amended to October 1, 2002.

All other terms and conditions of this policy remain unchanged.

NOV - 2 2000

Authorized Representative

 

ENDORSEMENT #0010

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## GENERAL AGGREGATE AMENDATORY ENDORSEMENT

Our General Aggregate Limit of Insurance shown in Item 3B of the Declarations applies separately in excess of each Aggregate Limit provided by the policy or policies listed in the Schedule Of Underlying Insurance

All other terms and conditions of this policy remain unchanged.

Authorized Representative

57724 (6/93)

NOV - 2 2000

ISSUED TO: MORGAN STANLEY DEAN WITTER & CO.

POLICY# BE 357 88 80

# SCHEDULE OF ENDORSEMENTS

| | |
|---|---|
| | Schedule of Underlying Insurance |
| ENDORSEMENT #001 | Named Insured Endorsement |
| ENDORSEMENT #002 | Foreign Liability Follow Form Endorsement |
| ENDORSEMENT #003 | Named Peril and Time Element Pollution Endorsement |
| ENDORSEMENT #004 | Employee Benefits Liability Follow Form Endorsement |
| ENDORSEMENT #005 | Cross Suits Endorsement |
| ENDORSEMENT #006 | Professional Liability Exclusion Endorsement |
| ENDORSEMENT #007 | Financial Institutions Endorsement |
| ENDORSEMENT #008 | Sexual Abuse and Molestation Exclusion Endorsement |
| ENDORSEMENT #009 | New York Amendatory Endorsement |

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

d. afte[redacted]nce of the policy or after the las[redacted]l date, discovery of an act or omission, or a violation of any policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current policy period;

e. material change in the nature or extent of the risk, occurring after issuance or last annual renewal anniversary date of the policy, which causes the risk of loss to be substantially and materially increased beyond that contemplated at the time the policy was issued or last renewed;

f. required pursuant to a determination by the New York Superintendent of Insurance that continuation of our present premium volume would jeopardize our solvency or be hazardous to the interests of our Insureds, our creditors or the public;

g. a determination by the New York Superintendent of Insurance that the continuation of the policy would violate, or would place us in violation of, any provision of the New York Insurance Law;

h. revocation or suspension of an Insured's license to practice his profession; or

i. where we have reason to believe that there is a probable risk or danger that you will destroy or permit the destruction of the insured property for the purpose of collecting the insurance proceeds, provided, however, that;

(1) a notice of cancellation on this ground shall inform you in plain language that you must act within ten days if review by the department of the ground for cancellation is desired pursuant to item (3) of this subparagraph i.;

(2) notice of cancellation on this ground shall be provided simultaneously by us to the department; and

(3) upon your written request made to the department within ten days from your receipt of notice of cancellation on this ground, the department shall undertake a review of the ground for cancellation to determine whether or not we have satisfied the criteria for cancellation specified in this subparagraph; if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground shall be deemed null and void.

Our notice of cancellation shall specify the grounds for cancellation.

**NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.**

4.  The ███ period will end on the day and hour stated in the cancellation notice.

5.  If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

6.  If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

7.  Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

8.  The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

9.  Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

10. We shall mail to you and to your authorized insurance agent or broker, written notice indicating our intention:

    a.  not to renew this policy;

    b.  to condition its renewal upon change of limits, change in type of coverage, reduction of coverage, increased deductible or addition of exclusions or upon increased premiums in excess of ten percent; (exclusive of any premium increase generated as a result of increased exposure units or as a result of experience rating, loss rating, or audit);

    c.  that the policy will not be renewed or will not be renewed upon the same terms, conditions or rates; such alternative renewal notice must be mailed or delivered on a timely basis and advise you that a second notice shall be mailed at a later date indicating our intention as specified in subparagraph a. or b. of this paragraph 10. and that coverage shall continue on the same terms, conditions and rates as expiring, until the later of the expiration date or Sixty (60) days after the second notice is mailed or delivered; such alternative renewal notice also shall advise you of the availability of loss information and, upon written request, we shall furnish such loss information within twenty days to you.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Page 3 of 4

11. A nonrenewal notice as specified in subparagraph a., a conditional renewal notice as specified in subparagraph b. and the second notice described in subparagraph c. of paragraph 10. shall contain the specific reason or reasons for nonrenewal or conditional renewal, and set forth the amount of any premium increase and nature of any other proposed changes.

12. the notice required by paragraph 10. shall be mailed at least Sixty (60) but not more than One Hundred Twenty (120) days in advance of the end of the policy period.

13. If we employ an alternative renewal notice as authorized by subparagraph c. of paragraph 10. we shall provide coverage on the same terms, conditions, and rates as the expiring policy, until the later of the expiration date or Sixty (60) days after the mailing of the second notice described in such subparagraph.

14. Prior to the expiration date of the policy, in the event that an incomplete or late conditional renewal notice or a late nonrenewal notice is provided by us, the policy period shall be extended, at the same terms and conditions as the expiring policy and at the lower of the current rates or the prior period's rates, until Sixty (60) days after such notice is mailed, unless you elect to cancel sooner.

15. In the event that a late conditional renewal notice or a late nonrenewal notice is provided by us on or after the expiration date of the policy, coverage shall remain in effect on the same terms and conditions of the expiring policy for another required policy period, and at the lower of the current rates or the prior period's rates unless you during the additional required policy period have replaced the coverage or elect to cancel, in which event such cancellation shall be on a pro rata premium basis.

16. Nothing herein shall be construed to limit the grounds for which we may lawfully rescind this policy or decline to pay a claim under this policy.

17. Notice required herein to be mailed to you shall [illegible] at the address shown in Item 1 [illegible]

18. Notice required [illegible] other first class [illegible] sent by registered, certified or [illegible] shall be equivalent to mailing.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

19. Proof of mailing of such notice as aforesaid shall be sufficient proof of notice. The policy period shall terminate at the effective date and hour of cancellation or nonrenewal specified in such notice.

All other terms and conditions of this policy remain unchanged.

Authorized Representative

60593 (6/94)



ENDORSEMENT #008

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## SEXUAL ABUSE OR MOLESTATION EXCLUSION

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of:

1. The actual, threatened or alleged sexual abuse, sexual molestation, sexual assault, sexual victimization, physical abuse, physical assault, any resulting mental or emotional injury or any coercion to engage in sexual activities on the part of any employee, assistant, volunteer or member of any facility owned, operated or maintained by the Insured; or
2. The negligent employment, investigation, supervision, reporting to the proper authorities or failure to so report or retention of any employee, assistant, volunteer or member of any facility owned, operated or maintained by the Insured whose conduct would be excluded by paragraph 1. above.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative



## ENDORSEMENT #007

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## FINANCIAL INSTITUTIONS ENDORSEMENT

This insurance does not apply to:

1. Bodily Injury or Property Damage arising out of the ownership, maintenance, operations, use, loading or unloading of any aircraft or watercraft in which the Insured has any financial interest;

2. Bodily Injury or Property Damage to or arising out of any property held by or in the care, custody or control of the Insured while the Insured is acting in any fiduciary capacity;

3. Property Damage to money, currency, coin, bank notes, Federal Reserve notes, postage and revenue stamps, U.S. Savings Stamps, bullion, precious metals of all kinds and in any form, articles made from such precious metals, jewelry, watches, necklaces, bracelets, gems, precious and semi-precious stones, bonds, securities, evidences of debts, debentures, script, certificates, receipts, warrants, rights, transfers, coupons, drafts, bills of exchange, acceptances, notes, checks, withdrawal orders, money orders, travelers, checks, letters of credit, bills of lading, abstracts of title, insurance policies, deeds, mortgages upon real estate and/or upon chattels and upon interests therein, and assignments of such policies, mortgages and instruments, other valuable papers and documents, and all other instruments similar to or in the nature of the foregoing; or

4. Any damages arising out of any act, error, or omission of any Insured or any agent or sub-agent of any Insured while acting in any fiduciary capacity.

The term "fiduciary capacity" as used in this endorsement shall include but not by way of limitation:

a. Administrator, ... under will or personal trust agreement, ... agent or sub-agent for any of the ... manager of real or personal property; or

b. ... agent, registrar, agent for voting trustees, dividend disbursing agent, paying agent, fiscal agent, transfer agent ... committee of holders of stock or securities, warrant agent, depository, or agent for capacity, including trustee under a corporate bond indenture, escrow agent or in any similar trust agent or receiver or trustee appointed by any court in receivership, bankruptcy or re-organization proceedings, a sinking fund

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

All other terms and conditions of this policy remain unchanged.

57709 (6/93)

Authorized Representative



ENDORSEMENT #006

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## PROFESSIONAL LIABILITY EXCLUSION

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of any act, error, omission, malpractice or mistake of a professional nature committed by the Insured or any person for whom the Insured is legally responsible.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative

 

ENDORSEMENT #005

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## CROSS SUITS EXCLUSION

This insurance does not apply to **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** arising out of any injuries initiated, alleged, or caused to be brought about by a **Named Insured** covered by this policy against any other **Named Insured** covered by this policy.

All other terms and conditions of this policy remain unchanged.

Authorized Representative

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.



ENDORSEMENT #004

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## EMPLOYEE BENEFITS LIABILITY FOLLOW-FORM ENDORSEMENT

(CLAIMS MADE VERSION)

## PROVIDES CLAIMS MADE COVERAGE -- PLEASE READ CAREFULLY

This insurance does not apply to **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of any negligent act, error or omission of the **Insured** or of any other person for whom the **Insured** is legally liable in the administration of the **Insured's** **Employee Benefit Programs** as defined herein.

However, if insurance for such **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** is provided by a policy listed in the Schedule of Underlying Insurance:

1. This exclusion shall not apply; and

2. The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance; and

3. Solely as respects this endorsement, our policy will only provide coverage for a claim made against the Insured during our policy period.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

If the insurance provided by the policy listed in the Schedule of Underlying Insurance provides coverage for **Occurrences** occurring on or after a specified Retroactive Date or for claims made during an Extended Reporting Period, the insurance provided by our policy will also provide such coverage.

For the purposes of this endorsement, the following definitions apply:

1. **Employee Benefit Programs** shall mean Group Life Insurance, Group Accident or Health Insurance, Pension Plans, Employee Stock Subscription Plans, Worker's Compensation, Unemployment Insurance, Social Security and Disability Benefits.

57828 (08/93)

 

2. **Administration** shall mean:

A. Giving counsel to employees with respect to Employee Benefits Programs;

B. Interpreting Employee Benefits Programs;

C. Handling of records in connection with Employee Benefits Programs; or

D. Effecting enrollment of employees under Employee Benefit Programs;

Provided all such acts are authorized by you.

All other terms and conditions of this policy shall remain unchanged.

(Authorized Representative)

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

57826 (06/93)

 

ENDORSEMENT #003 

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## NAMED PERIL AND TIME ELEMENT POLLUTION ENDORSEMENT

Exclusion M of this policy is hereby deleted in its entirety and replaced by the following:

This insurance does not apply to:

1. Bodily Injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

2. Any loss, cost or expense arising out of any governmental direction or request that we, the Insured or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants; or

3. Any loss, cost, or expense, including but not limited to costs of investigation or attorney's fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

As used in this exclusion, pollutants means any [illegible] thermal irritant or contaminant, including [illegible] chemicals and waste material. waste ma[illegible] intended to be or have been recycled, reconditioned [illegible]

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

However, this exclusion does not apply to Bodily Injury, Property Damage or Personal Injury arising out of:

1. Any discharge, dispersal, seepage, migration, release or escape directly or indirectly caused by fire, explosion, lightning, windstom, vandalism or malicious mischief, riot and civil commotion, flood, earthquake, collision, or upset of a motor vehicle, mobile equipment or aircraft, automatic sprinkler leakage;

2. The Products - Completed Operations Hazard; or

 

3. Any discharge, dispersal, seepage, migration, release or escape of pollutants that meets all of the following conditions:

   a. It was accidental and neither expected nor intended by the **Named Insured**. This condition would not serve to deny coverage for a specific incident where such discharge, dispersal, seepage, migration, release or escape of pollutants was a result of an attempt by the **Insured** to mitigate or avoid a situation where substantial third party **Bodily Injury**, **Property Damage** or **Personal Injury** could occur; and

   b. It was demonstrable as having commenced on a specific date during the term of this policy; and

   c. Its commencement became known to the **Named Insured** within twenty (20) calendar days and was further reported to the Risk Management Department within a reasonable time frame; and

   d. Its commencement was reported in writing to us within eighty (80) calendar days of becoming known to the Risk Management Department; and

   e. Reasonable effort was expended by the **Named Insured** to terminate the situation as soon as conditions permitted.

   However, nothing contained in this Provision 3. shall operate to provide any coverage with respect to:

   a. Any site or location principally used by the **Insured**, or by others on the **Insured's** behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material;

   b. Any fines or penalties;

   c. Any clean up costs ordered by the Superfund Program, or any federal, state, or local governmental authority. However, this specific exclusion shall not serve to deny coverage for third party clean up costs otherwise covered by this endorsement simply because of the involvement of a governmental authority;

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

   d. Acid rain;

   e. Clean up, removal, containment, treatment, detoxification or neutralization of pollutants situated on premises the **Insured** owns, rents or occupies at the time of the actual discharge, dispersal, seepage, migration, release or escape of said pollutants; or

 

It is further agreed that solely as respects any coverage granted by this endorsement:

1. The Self Insured Retention in **Item 3. D.** of the Declarations is amended to **$1,000,000**;

2. In **Section II**, Defense, **provision A. 2** is hereby deleted in its entirety; and

3. We will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the **Insured**. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any **Occurrence** which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

It is further agreed that in the event of a disagreement as to the interpretation of this endorsement, the disagreement shall be submitted to binding arbitration before a panel of three (3) arbitrators. Within thirty (30) days of a written request for arbitration by either you or us, each party will choose an arbitrator. If the two arbitrator are unable to agree within one month upon the third arbitrator, such arbitrator shall at the request of either party be selected by the American Arbitration Association in accordance with its rules and procedures.

The parties shall submit their cases to the panel by written and oral evidence at a hearing time and place selected by the third arbitrator. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at lease two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud and gross misconduct by the arbitrators. The award will be issued within thirty (30) days of the close of the hearings. Each party shall bear the expenses of its designated arbitrator and shall jointly and equally share with the other the expense of the third arbitrator and of the arbitration.

The arbitration proceedings shall take place in or in the vicinity of New York, N.Y. The procedural rules applicable to this arbitration shall, except as provided otherwise herein, be in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative

 

ENDORSEMENT #002

This endorsement, effective 12:01 a.m. 10/01/98 forms a part of

Policy NO.: BE 357 88 80 issued to: MORGAN STANLEY DEAN WITTER & CO.

by NATIONAL UNION FIRE INSURANCE COMPANY OF PITTBURGH, PA

## FOREIGN LIABILITY FOLLOW-FORM ENDORSEMENT

This insurance does not apply to **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that occurs outside the United States of America, its territories and possessions, Puerto Rico and Canada.

However, if insurance for such **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** is provided by a policy listed in the Schedule of Underlying Insurance:

1. This exclusion shall not apply; and

2. The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule Of Underlying Insurance.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

Authorized Representative



ENDORSEMENT #001

This endorsement, effective 12:01 a.m.      10/01/98      forms a part of

Policy NO.:    BE 357 88 80    issued to    MORGAN STANLEY DEAN WITTER & CO.

by    NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA

## NAMED INSURED ENDORSEMENT

It is hereby understood and agreed, Item #1, Named Insured of the Declarations Page is amended to read as follows:

Morgan Stanley Dean Witter & Co. and/or all subsidiaries, affiliates, related companies and joint ventures as they may now exit or hereafter be constituted. The terms "subsidiaries, affiliates, related companies and joint ventures" shall mean those companies or other legal entities in which the named insured has 50% or more ownership interest and/or managing control.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

AUTHORIZED REPRESENTATIVE

 

ISSUED TO: MORGAN STANLEY DEAN WITTER & CO.

POL. NO.: BE 357 88 80

# SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF COVERAGE | INSURER POLICY NO. POLICY DATE | LIMITS OF LIABILITY |
|---|---|---|
| COMMERCIAL GENERAL LIABILITY | FEDERAL INS. CO. #35321873 10/01/98 - 10/01/01 | $1,000,000 EACH OCCURRENCE<br>$1,000,000 PRODUCTS/COMPLETED OPERATIONS AGGREGATE<br>$1,000,000 NON-OWNED & HIRED CAR LIABILITY<br>$1,000,000 PERSONAL & ADV INJURY<br>$3,000,000 GENERAL AGGREGATE-PER LOC. |
| *NOTE: COVERAGE IS PROVIDED ANYWHERE IN THE WORLD. | | |
| COMMERICAL GENERAL LIABILITY PUERTO RICO | FEDERAL INS. CO. #35291609 10/01/98 - 10/01/99 | $1,000,000 EACH OCCURRENCE<br>$1,000,000 GENERAL AGGREGATE<br>$1,000,000 PRODUCTS/COMPLETED OPERATIONS AGGREGATE<br>$1,000,000 PERSONAL & ADV INJURY<br>$ 100,000 PROPERTY DAMAGE TO RENTED PREMISES LIMIT<br>$ 10,000 MEDICAL EXPENSE |
| COMMERCIAL AUTO LIABILITY | LIBERTY MUTUAL INS. CO. #AS2621-004305-068 10/01/98 - 10/01/99 | $1,000,000 COMBINED SINGLE LIMIT |
| EMPLOYERS LIABILITY UNITED STATES | LIBERTY MUTUAL INS. CO #WA282D004305018 #WC2831004305178 #EW782N004305098 10/01/98 - 10/01/99 | $1,000,000 EACH ACCIDENT<br>$1,000,000 POLICY LIMIT<br>$1,000,000 EACH EMPLOYEE |
| EMPLOYERS LIABILITY UNITED KINGDOM | INDEPENDENT INS. CO. LTD #023223/01/98 | 10,000,000 ANY ONE EVENT BRITISH POUNDS |
| EMPLOYEE BENEFITS LIABILITY | FEDERAL INS. CO. #35291609 10/01/98 - 10/01/01 | $1,000,000 EACH CLAIM<br>$1,000,000 AGGREGATE LIMIT |
| AIRCRAFT LIABILITY | ASSOC. AVIATION UNDERWRITERS #BHV-309009 06/30/98 - 06/3099 AND RENEWAL POLICY | COMBINED SINGLE LIMIT<br>$300,000,000 PER OCCURRENCE<br>ANNUAL AGGREGATE WHERE APPLICABLE |



# Commercial Umbrella Policy Form

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and wh is and is not covered.

Throughout this policy, the words "you" and "your" refer to the Named Insured as defined in Insuring Agreement I Definitions. The words "we", "us" and "our" refer to the Company providing this insurance. The word "Insure means any person or organization qualifying as such in Insuring Agreement IV, Definitions.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations we agree wi you to provide coverage as follows:

## Insuring Agreements

**I. Coverage**

We will pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured become legally obligated to pay by reason of liability imposed by law or assumed by the Insured under an Insure Contract because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that take place during the Policy Period and is caused by an Occurrence happening anywhere in the world. The amour we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

If we are prevented by law or statute from paying on behalf of the Insured, then we will, where permitted by la or statute, indemnify the Insured for those sums in excess of the Retained Limit.

**II. Defense**

A. We shall have the right and duty to defend any claim or suit seeking damages covered by the terms an conditions of this policy when:

1. The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlyin Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies; or

2. Damages are sought for Bodily Injury, Property Damage, Personal Injury or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

B. When we assume the defense of any claim or suit:

1. We will defend any suit against the Insured seeking damages on account of Bodily Injury, Property Damage, Personal Injury or Advertising Injury even if such suit is groundless, false or fraudulent, but we have the right to investigate, defend and settle the claim as we deem expedient.

2. We will pay the following, to the extent that they are not included in the underlying policies listed in the Schedule of Underlying Insurance or in any other insurance providing coverage to the Insured:

a. premiums on bonds to release attachments for amounts not exceeding our Limits of Insurance, but we are not obligated to apply for or furnish any such bond;

b. premiums on appeal bonds required by law to appeal any claim or suit we defend, but we are not obligated to apply for or furnish any such bond;

c. all costs taxed against the Insured in any claim or suit we defend;

d. [illegible]ent interest awarded against the Insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer;

e. all interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within our applicable Limit of Insurance;

f. the Insured's expenses incurred at our request.

We will not defend any suit or claim after our applicable Limits of Insurance have been exhausted by payment of judgments or settlements.

All expenses we incur in the defense of any suit or claim are in addition to our Limits of Insurance.

C. In all other instances except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

## III. Limits of Insurance

A. The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay regardless of the number of:

1. Insureds;
2. Claims made or suits brought; or
3. Persons or organizations making claims or bringing suits.

B. The General Aggregate Limit is the most we will pay for all damages covered under Insuring Agreement I except:

1. Damages included in the Products-Completed Operations Hazard; and
2. Coverages included in the policies listed in the Schedule of Underlying Insurance to which no underlying aggregate limit applies.

C. The Products-Completed Operations Aggregate Limit is the most we will pay for all damages included in the Products-Completed Operations Hazard.

D. Subject to B. and C. abo[illegible] sum of damages cove[illegible] Personal Injury and Ad[illegible] most we will pay for the [illegible]ry, Property Damage,

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

If the applicable limits of [illegible] Schedule of Underlying Insurance or of other insurance providing coverage to the Insured are reduced or exhausted by payment of one or more claims that would be insured by our policy we will:

1. In the event of reduction, pay in excess of the reduced underlying limits of insurance; or
2. In the event of exhaustion of the underlying limits of insurance, continue in force as underlying insurance.

The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

E. Retained Lim..

We will be liable only for that portion of damages in excess of the Insured's Retained Limit which defined as the greater of either:

1. The total of the applicable limits of the underlying policies listed in the Schedule of Underlyi Insurance and the applicable limits of any other underlying insurance providing coverage to th Insured; or

2. The amount stated in the Declarations as Self Insured Retention as a result of any o Occurrence not covered by the underlying policies listed in the Schedule of Underlying Insuranc nor by any other underlying insurance providing coverage to the Insured;

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

IV. **Definitions**

A. **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or mo of the following offenses:

1. Oral or written publication of material that slanders or libels a person or organization or disparage a person's or organization's goods, products or services;
2. Oral or written publication of material that violates a person's right of privacy;
3. Misappropriation of advertising ideas or style of doing business; or
4. Infringement of copyright, title or slogan.

B. **Auto** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including an attached machinery or equipment. But auto does not include mobile equipment.

C. **Bodily Injury** means bodily injury, sickness, disability or disease. Bodily Injury shall also mean ment injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sicknes disability or disease.

D. **Impaired Property** means tangible property, other than Your Product or Your Work, that cannot b used or is less useful because:

1. It incorporates Your Product or Your Work that is known or thought to be defective, deficien inadequate or dangerous; or
2. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1. The repair, replacement, adjustment or removal of Your Product or Your Work; or
2. Your fulfilling the terms of the contract or agreement.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

E. **Insured** means each of the following, to the extent set forth:

1. The **Named Insured**, meaning:

a. any person or organization listed in Item 1 of the Declarations, and any company that is your subsidiary as of the effective date of this policy and any company you own or contro as of the effective date of this policy; and

b. any organization newly acquired, controlled or formed by you during the policy period but only:

respects Occurrences taking plac... after you acquire, take control or form suc organization;

2) if such organization is included under the coverage provided by the policies listed i the Schedule of Underlying Insurance; and

3) if you give us prompt notice after you acquire, take control or form suc organization.

We may make an additional premium charge for any additional organizations you acquire form or take control of during the period of this policy.

2. If you are an individual, you and your spouse, but only with respect to the conduct of a business of whic you are the sole owner.

3. If you are a partnership or joint venture, the partners or members and their spouses but only as respect the conduct of your business.

No person or organization is an Insured with respect to the conduct of any current or past partnershi or joint venture that is not shown as a Named Insured in the Declarations.

4. Any person or organization, other than the Named Insured, included as an additional insured in th policies listed in the Schedule of Underlying Insurance but not for broader coverage than is available t such person or organization under such underlying policies.

5. Any of your partners, executive officers, directors, stockholders or employees but only while acting withi their duties.

However, the coverage granted by this provision 5. does not apply to the ownership, maintenance, use loading or unloading of any autos, aircraft or watercraft unless such coverage is included under th policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provide under such underlying policies.

6. Any person, other than one of your employees, or organization while acting as your real estate manager

7. Any person, organization, trustee or estate to whom you are obligated by a written Insured Contract t provide insurance such as is afforded by this policy but only with respect to:

a. liability arising out of operations conducted by you or on your behalf; or

b. facilities owned or used by you.

8. Any person (other than your partners, ... employees) o organization with respect to any auto ... on your behalf an used with your permission.

However, the coverage granted by this provision 8. does not apply to any person using an auto whil working in a business that sells, services, repairs or parks autos unless you are in that business.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

F. Insured Contract means any oral or written contract or agreement entered into by you and pertaining to you business under which you assume the tort liability of another party to pay for Bodily Injury, Property Damage Personal Injury or Advertising Injury to a third person or organization. Tort liability means a liability tha would be imposed by law in the absence of any contract or agreement.

G. Mobile Equipment means any of the following types of land vehicles, including any attached machinery o equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that ███ on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted

    a. power cranes, shovels, loaders, diggers or drills; or

    b. road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primar to provide mobility to permanently attached equipment of the following types:

    a. air compressors, pumps and generators, including spraying, welding, building cleanin geophysical exploration, lighting and well servicing equipment; or

    b. cherry pickers and similar devices used to raise or lower workers;

6. Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than th transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are n mobile equipment but will be considered autos:

    a. equipment designed primarily for:

        1) snow removal;

        2) road maintenance, but not construction or resurfacing; or

        3) street cleaning;

    b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise o lower workers; and

    c. air compressors, pumps and generators, including spraying, welding, building cleaning geophysical exploration, lighting and well servicing equipment.

H. **Occurrence means:**

1. As respects Bodily Injury or Property Damage, an accident, including continuous or repeater exposure to conditions, which results in Bodily Injury or Property Damage neither expected no intended from the standpoint of the Insured. All such exposure to substantially the same genera conditions shall be considered as arising out of one Occurrence.

2. As respects Personal Injury, an offense committed in the course of your business that results in Personal Injury All damages that arise from the same, related or repeated injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claims.

          NOTICE: THESE POLICY FORMS ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

3. As respects Advertising Injury, an offense committed in the course of advertising your goods, products and services that results in Advertising Injury. All damages that arise from the same or related injurious material or act shall be considered as arising out of one Occurrence, regardless of the frequency of repetition thereof, the number and kind of media used and the number of claimants.

I. **Personal Injury means** injury other than Bodily Injury or Advertising Injury arising out of one or more of the following offenses:

1. False arrest, detention or imprisonment;

2. Malicious prosecution;

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

J. 1. **Products-Completed Operations Hazard** includes all **Bodily Injury** and **Property Damage** occurring away from premises you own or rent and arising out of **Your Product** or **Your Work** except:

a. products that are still in your physical possession; or

b. work that has not yet been completed or abandoned.

2. **Your Work** will be deemed completed at the earliest of the following times:

a. When all of the work called for in your contract has been completed.

b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

3. This hazard does not include **Bodily Injury** or **Property Damage** arising out of:

a. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the loading or unloading of it;

b. the existence of tools, uninstalled equipment [illegible]

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

K. **Property Damage** means [illegible]

1. Physical injury to ta[illegible] loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the **Occurrence** that caused it.

L. **Suit** means a civil proceeding in which **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** to which this insurance applies is alleged. **Suit** includes:

1. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

2. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

M. **Your Product** means:

1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

a. you;

b. others trading under your name; or

c. a person or organization whose business or assets you have acquired; and

2. Conta... (other than vehicles) materials, parts or equipment furnished in connection with su... goods or products.

Your Product includes:

1. Warranties or representations made at any time with respect to the fitness, quality, durabil... performance or use of Your Product; and

2. The providing of or failure to provide warnings or instructions.

Your Product does not include vending machines or other property rented to or located for the use ... others but not sold.

N. Your Work means:

1. Work or operations performed by you or on your behalf; and

2. Materials, parts or equipment furnished in connection with such work or operations.

O. Your Work includes:

1. Warranties or representations made at any time with respect to the fitness, quality, durabilit... performance or use of Your Work; and

2. The providing of or failure to provide warnings or instructions.

V. **Exclusions**

This insurance does not apply to:

A. Any obligation of the Insured under a Workers Compensation, Unemployment Compensation ... Disability Benefits Law, or under any similar law.

B. Any obligation of the Insured under the Employees' Retirement Income Security Act of 1974 or an... amendments to that act.

C. Any obligation of the Insured under a "No Fault", "Uninsured Motorist" or "Underinsured Motorist" law

D. Property Damage to :

1. Property you own, rent, occupy ...

2. Personal property in the care, custody or control of the Insured.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

E. Property Damage to Impaired Property or property that has not been physically injured, arising out of

1. A defect, deficiency, inadequacy or dangerous condition in Your Product or Your Work; or

2. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement i... accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidenta... physical injury to Your Product or Your Work after it has been put to its intended use.

F. Property Damage to Your Product arising out of it or any part of it.

G. Property Damage to Your Work arising out of it or any part of it and included in the Products-Completed Operations Hazard.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

H. Damages cla[illegible] any loss, cost or expense incurred b[illegible] [illegible]thers for the loss of use, withdrawal recall, inspection, repair, replacement, adjustment, removal or disposal of:

1. **Your Product**;
2. **Your Work**; or
3. **Impaired Property**

If such product, work or property is withdrawn or recalled from the market or from use by any person o organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition ii it.

I. Liability of any employee with respect to **Bodily Injury** or **Personal Injury** to another employee of th same employer injured in the course of such employment.

However, if insurance for such liability is provided by a policy listed in the Schedule of Underlyin Insurance:

1. This exclusion shall not apply; and
2. The insurance provided by our policy will not be broader than the insurance coverage provided t the employee by the policy listed in the Schedule of Underlying Insurance.

J. **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, operation, use, loadin or unloading of any watercraft or any aircraft owned by the **Insured** or rented to the **Insured** without crew.

However, if insurance for such **Bodily Injury** or **Property Damage** is provided by a policy listed in th Schedule of Underlying Insurance:

1. This exclusion shall not apply; and
2. The insurance provided by our policy will not be broader than the insurance coverage provide by the policy listed in the Schedule of Underlying Insurance;

K. **Personal Injury** or **Adve**[illegible]**:**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

1. Arising out of oral [illegible] with knowledge of i[illegible] direction of the Insure
2. Arising out of oral [illegible] publication of material whose first publication took place before th beginning of the policy period;
3. Arising out of the willful violation of a penal statute or ordinance committed by or with the consen of the **Insured**; or
4. For which the **Insured** has assumed liability in a contract or agreement. This exclusion does nc apply to liability for damages that the **Insured** would have in the absence of the contract c agreement.

L. **Advertising Injury** arising out of:

1. Breach of contract, other than misappropriation of advertising ideas under an implied contract;
2. The failure of goods, products or services to conform with advertised quality or performance;
3. The wrong description of the price of goods, products or services; or
4. An offense committed by an **Insured** whose business is advertising, broadcasting, publishing c telecasting.

**M.** 1. **Bodily I[illegible], Property Damage or Personal Inj[illegible] ar[illegible]ng** out of the actual or threatene discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

2. Any loss, cost or expense arising out of any governmental direction or request that we, th **Insured** or any other person or organization test for, monitor, clean-up, remove, contain, trea detoxify, neutralize or assess the effects of pollutants; or

3. Any loss, cost, or expense, including but not limited to costs of investigation or attorneys' fee incurred by a governmental unit or any other person or organization to test for, monitor, clean-up remove, contain, treat, detoxify or neutralize pollutants.

This exclusion M. shall not apply to **Bodily Injury, Property Damage** or **Personal Injury** arisin out of:

a. Heat, smoke or fumes from a hostile fire;

b. The upset, overturn or collision of a motor vehicle; or

c. The **Products-Completed Operations Hazard;**

if insurance for such **Bodily Injury, Property Damage** or **Personal Injury** is provided by a polic listed in the Schedule of Underlying Insurance. However, the insurance provided by our policy fo such **Bodily Injury, Property Damage** or **Personal Injury** will not be broader than the insuranc coverage provided by the policy listed in the Schedule of Underlying Insurance.

As used in this exclusion:

a. Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste materia includes materials which are intended to be or have been recycled, reconditioned o reclaimed;

b. A hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

**N.** **Bodily Injury** or **Property** [illegible] due to war, whether or not [illegible] to war. War includes civil war, [illegible] rebellion or revolution [illegible] assumed under a contract or [illegible] condition incident

**O.** **Bodily Injury** or **Property** Da[illegible] applies only to liability [illegible] intended from the standpoint of the **Insured**.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

However, this exclusion does not apply to **Bodily Injury** resulting from the use of reasonable force to protect persons or property.

**P.** 1. **Bodily Injury, Property Damage** or **Personal Injury** arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

2. Any obligation of the **Insured** to indemnify any party because of damages arising out of such **Bodily Injury, Property Damage** or **Personal Injury** as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

3. Any obligation to defend any suit or claim against the **Insured** alleging **Bodily Injury, Property Damage** or **Personal Injury** and seeking damages, if such suit or claim arises from **Bodily Injury, Property Damage** or **Personal Injury** as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust.

Q. **Bodily Injur**...**onal Injury** to:

1. A person arising out of any:

   a. Refusal to employ that person;

   b. Termination of that person's employment; or

   c. Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

2. The spouse, child, parent, brother or sister of that person as a consequence of **Bodily Injury** or **Personal Injury** to that person at whom any of the employment-related practices described in paragraph a., b. or c. above is directed.

This exclusion applies:

1. Whether the **Insured** may be liable as an employer or in any other capacity; and

2. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

R. **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of or by reason of:

1. The purchase, sale, offer of sale, or solicitation of any security, debt, bank deposit or financial interest or instrument;

2. Any representations made at any time in relation to the price or value of any security, debt, bank deposit or financial interest or instrument; or

3. Any depreciation or decline in price or value of any security, debt, bank deposit or financial interest or instrument.

S. **Bodily Injury** or **Property Damage** for which any **Insured** may be held liable by reason of:

1. Causing or contributing to the intoxication of any person;

2. The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

3. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

However, if insurance for such **Bodily Injury** or **Property Damage** is provided by a policy listed in the Schedule of Underlying Insurance:

1. This exclusion shall not apply; and

2. The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

T. **Bodily Injury** or **Property Damage**:

1. a. with respect to which the **Insured** is also an insured under a nuclear energy liability policy issued by the Nuclear Energy Liability-Property Insurance Assoc., Mutual Atomic Energy Liability Underwriters or the Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

1. b. ... from the hazardous properties of nuclear material and with respect to which (1 any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, (2) the Insured is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

2. **Bodily Injury** or **Property Damage** resulting from the hazardous properties of nuclear material if:

   a. the nuclear material (1) is at any nuclear facility owned by the **Insured** or operated by the **Insured** or on the **Insured's** behalf, or (2) has been discharged or dispensed therefrom;

   b. the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the **Insured** or on the **Insured's** behalf; or

   c. the **Bodily Injury** or **Property Damage** arises out of the furnishing by the **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to **Property Damage** to such nuclear facility and any property thereat.

3. As used in this exclusion:

   a. "hazardous properties" includes radioactive, toxic or explosive properties;

   b. "nuclear material" means source material, special nuclear material or by-product material;

   c. "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

   d. "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

   e. "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of a nuclear facility included within the definition of nuclear facility below;

   f. "nuclear facility" means:

      1) any nuclear reactor;

      2) any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging wastes;

      3) any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the **Insured's** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

      4) any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

   g) "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

h) Property Damage includes all forms of radioactive contamination of property.

## VI. Conditions

### A. Appeals

If the Insured or the Insured's underlying insurers do not appeal a judgment in excess of the Retained Limit, we have the right to make such an appeal. If we elect to appeal, our liability on such an award or judgment shall not exceed our Limits of Insurance as stated in Item 3 of the Declarations plus the cost and expense of such appeal.

### B. Audit

We may audit and examine your books and records as they relate to this policy at any time during the period of this policy and for up to three years after the expiration or termination of this policy.

### C. Bankruptcy or Insolvency

Your bankruptcy, insolvency or inability to pay or the bankruptcy, insolvency or inability to pay of any of your underlying insurers will not relieve us from the payment of any claim covered by this policy.

But under no circumstances will such bankruptcy, insolvency or inability to pay require us to drop down and replace the Retained Limit or assume any obligation within the Retained Limit area.

### D. Cancellation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancellation notice.

4. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

5. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

6. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

7. The first Named Insured in Item 1 of the Declarations shall act on behalf of all other Insureds with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

 

E. Changes

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waive or a change in any part of this policy. This policy can only be changed by a written endorsement tha becomes a part of this policy and that is signed by one of our authorized representatives.

F. Duties In The Event Of An Occurrence, Claim Or Suit

1. You must see to it that we are notified as soon as practicable of an Occurrence which may resul in a claim under this policy. To the extent possible, notice should include:

   a. how, when and where the Occurrence took place;

   b. the names and addresses of any injured persons and witnesses; and

   c. the nature and location of any injury or damage arising out of the Occurrence.

2. If a claim is made or suit is brought against any Insured that is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

3. You and any other Involved Insured must:

   a. immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

   b. authorize us to obtain records and other information;

   c. cooperate with us in the investigation, settlement or defense of the claim or suit; and

   d. assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

4. No Insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

G. Inspection

We have the right, but are not obligated, to inspect your premises and operations at any time. Our inspections are not safety inspections. They relate only to the insurability of your premises and operations and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person or organization to provide for the health or safety of your employees or the public. We do not warrant that your premises or operations are safe or healthful or that they comply with laws, regulations, codes or standards.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

H. Legal Actions Against Us

There will be no right of action against us under this insurance unless:

1. You have complied with all the terms of this policy; and

2. The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability.

I. Maintenance of Underlying Insurance

During the period of this policy, you agree:

1. To keep the policies listed in the Schedule of Underlying Insurance in full force and effect;

2. That a[illegible]als or replacements of the policies [illegible] the Schedule of Underlying Insurance will not be more restrictive in coverage;

3. That the limits of insurance of the policies listed in the Schedule of Underlying Insurance shall not change except for any reduction or exhaustion of aggregate limits by payment of claims for Occurrences covered by this policy; and

4. That the terms, conditions and endorsements of the policies listed in the Schedule of Underlying Insurance will not materially change during the period of this policy.

If you fail to comply with these requirements, we will only be liable to the same extent that we would had you fully complied with these requirements.

J. Other Insurance

If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

K. Premium

The first Named Insured designated in Item 1 of the Declarations shall be responsible for payment of all premiums when due.

The premium for this policy shall be computed on the basis set forth in Item 4 of the Declarations. At the beginning of the policy period, you must pay us the Advance Premium shown in Item 4 of the Declarations.

When this policy expires or if it is cancelled, we will compute the earned premium for the time this policy was in force. If this policy is subject to audit adjustment, the actual exposure basis will be used to compute the earned premium. If the earned premium is greater than the Advance Premium, you will promptly pay us the difference. If the earned premium is less than the Advance Premium, we will return the difference to you. But in any event we shall retain the Minimum Premium as shown in Item 4 of the Declarations for each twelve months of our policy period.

L. Prior Insurance

If a loss covered by this policy is also covered in whole or in part under any other excess policy issued to the Insured prior to the effective date of this policy, our Limits of Insurance as stated in Item 3 of the Declarations will be reduced by any amounts due the Insured under such prior insurance.

M. Separation of Insureds

Except with respect to our Limits of Insurance, [illegible] assigned to the first Named Insured designated in Item 1 of the [illegible]

1. As if each Named Insured were the only Named Insured; and

2. Separately to each Insured against whom claim is made or Suit brought.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

N. Subrogation

If any Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after loss to impair these rights and must help us enforce them.

Any recoveries shall be applied as follows:

1. Any interests, including the Insured, that have paid an amount in excess of our payment under this policy will be reimbursed first;



2. We the[illegible] reimbursed up to the amount we ha[illegible] paid, and

3. Lastly, any interests, including the Insured, over which our insurance is excess, are entitled claim the residue.

Expenses incurred in the exercise of rights of recovery shall be apportioned between the interest including the Insured, in the ratio of their respective recoveries as finally settled.

O. Transfer Of Your Rights And Duties

Your rights and duties under this policy may not be transferred without our written consent.

If you die or are legally declared bankrupt, your rights and duties will be transferred to your leg representative but only while acting within the scope of duties as your legal representative. Howeve notice of cancellation sent to the first Named Insured designated in Item 1 of the Declarations ar mailed to the address shown in this policy will be sufficient notice to effect cancellation of this policy.

P. When Loss Is Payable

Coverage under this policy will not apply unless and until the Insured or the Insured's underlying insur is obligated to pay the Retained Limit.

When the amount of loss has finally been determined, we will promptly pay on behalf of the Insured th amount of loss falling within the terms of this policy.

You shall promptly reimburse us for any amount within the Self Insured Retention paid by us on beha of an Insured.

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unles countersigned by one of our duly authorized representatives, where required by law.

Elizabeth M. Tuck
SECRETARY

J. P. Cavoores
PRESIDENT

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE DEPARTMENT.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **NEXTCARD, LLC,**<br>**Plaintiff,**<br><br>**v.**<br><br>**AMERICAN EXPRESS COMPANY, DISCOVER FINANCIAL SERVICES LLC, HSBC NORTH AMERICA HOLDINGS INC., HSBC USA, INC., and THE PNC FINANCIAL SERVICES GROUP, INC.**<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CIVIL ACTION NO. 2:07-cv-354 (TJW)**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff NextCard, LLC ("Plaintiff" or "NextCard"), by and through its undersigned counsel, files this Complaint against Defendants American Express Company, Discover Financial Services LLC, HSBC North America Holdings, Inc., HSBC USA, Inc. and The PNC Financial Services Group, Inc. as follows:

**NATURE OF THE ACTION**

1. This lawsuit pertains to Defendants' infringement of some or all of the following patents: U.S. Patent No. 6,405,181, titled "Method and Apparatus for Real Time On Line Credit Approval" (the "'181 Patent"); U.S. Patent No. 6,567,791, titled "Method and Apparatus for a Verifiable On Line Rejection of an Application for Credit" (the "'791 Patent"); U.S. Patent No. 7,143,063, titled "Method and Apparatus for a Verifiable On Line Rejection of an Applicant for Credit" (the "'063 Patent"); and U.S. Patent No. 6,718,313, titled "Integrating Live Chat Into an Online Credit Card Application" (the "'313 Patent") (collectively, the "Patents"). Copies of the Patents are attached hereto as Exhibits "A" through "D."

**PARTIES**

2. Plaintiff NextCard, LLC is a limited liability company organized under the laws of the State of Texas, with its principal place of business at 104 E. Houston Street, Suite 145, Marshall, Texas 75670. NextCard is the assignee of all right, title, and interest in and to the Patents.

3.    Defendant American Express Company ("American Express") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 3 World Financial Center, 200 Vesey Street, New York, New York 10285. American Express does business in the State of Texas and in the Eastern District of Texas.   American Express may be served via its registered agent for service of process, CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

4.    Defendant Discover Financial Services, LLC ("Discover Financial Services") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 2500 Lake Cook Road, Riverwoods, Illinois 60015. Discover Financial Services does business in Texas and in the Eastern District of Texas.   Discover Financial Services may be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5.    Defendant HSBC North America Holdings, Inc. ("HSBC North American Holdings") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2700 Sanders Road, Prospect Heights, Illinois 60070. HSBC North America Holdings does business in Texas and in the Eastern District of Texas. HSBC North America Holdings may be served via its registered agent

for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

6. Defendant HSBC USA, Inc. ("HSBC USA") is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 11 East Chase Street, Baltimore, Maryland 21202. HSBC USA does business in Texas in the Eastern District of Texas. HSBC USA may be served via its registered agent for service of process The Corporation Trust Incorporated, 300 E. Lombard Street, Baltimore, Maryland 21202.

7. Defendant The PNC Financial Services Group, Inc. ("PNC Financial Services") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 1 PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222. PNC Financial Services does business in Texas and in the Eastern District of Texas. PNC Financial Services may be served with process at 1 PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

**JURISDICTION AND VENUE**

8. This action arises under the patent laws of the United States, 35 U.S.C. § *et seq.*, including 35 U.S.C. § 271. This Court has subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

9. The Court has personal jurisdiction over each Defendant. Each Defendant has conducted and does conduct business within the State of Texas. Each Defendant,

directly and/or through intermediaries (including subsidiaries, distributors, third party administrators, etc.), offers for sale, sells, and advertises its products and services in the United States, the State of Texas, and the Eastern District of Texas. Each Defendant, directly and/or through intermediaries, has committed the tort of patent infringement within the State of Texas, and, more particularly, within the Eastern District of Texas.

10. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. §§1391 and 1400(b).

**COUNT I – INFRINGEMENT OF U.S. PATENT 6,405,181**

11. NextCard refers to and incorporates herein the allegations of Paragraphs 1-10 above.

12. The '181 Patent was duly and legally issued by the United States Patent and Trademark Office on June 11, 2002 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '181 Patent and possesses all rights of recovery under the '181 Patent.

13. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '181 Patent by offering credit to consumers via applications that are transmitted over the internet for real-time approval in accordance with the methods and systems claimed in the '181 patent.

14. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

15. Upon information and belief, each Defendant's infringement of the '181 Patent has been willful and deliberate, entitling NextCard to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

16. Each Defendant's infringement of NextCard's exclusive rights under the '181 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT II – INFRINGEMENT OF U.S. PATENT 6,567,791**

17. NextCard refers to and incorporates herein the allegations of Paragraphs 1-16 above.

18. The '791 Patent was duly and legally issued by the United States Patent and Trademark Office on May 20, 2003 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '791 Patent and possesses all rights of recovery under the '791 Patent.

19. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '791 Patent by presenting credit applicants with reasons for

rejection of the credit application in accordance with the methods and systems claimed by the '791 Patent.

20. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

21. Upon information and belief, each Defendant's infringement of the '791 Patent has been willful and deliberate, entitling NextCard to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

22. Each Defendant's infringement of NextCard's exclusive rights under the '791 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT III – INFRINGEMENT OF U.S. PATENT 7,143,063**

23. NextCard refers to and incorporates herein the allegations of Paragraphs 1-22 above.

24. The '063 Patent was duly and legally issued by the United States Patent and Trademark Office on November 28, 2006 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '063 Patent and possesses all rights of recovery under the '063 Patent.

25. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '063 Patent by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '063 Patent.

26. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

27. Upon information and belief, each Defendant's infringement of the '063 Patent has been willful and deliberate, entitling NextCard to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

28. Each Defendant's infringement of NextCard's exclusive rights under the '063 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT IV – INFRINGEMENT OF U.S. PATENT 6,718,313**

29. NextCard refers to and incorporates herein the allegations of Paragraphs 1-28 above.

30. The '313 Patent was duly and legally issued by the United States Patent and Trademark Office on April 6, 2004, after full and fair examination. NextCard is the

assignee of all rights, title, and interest in and to the '313 Patent and possesses all rights of recovery under the '313 Patent.

31. Defendants American Express, Discover Financial Services, HSBC North America Holdings, and HSBC USA each has infringed and/or continues to infringe the '313 Patent by incorporating online chat features into their internet credit card offerings/applications in accordance with the methods and systems claimed by the '313 Patent.

32. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

33. Upon information and belief, each Defendant's infringement of the '313 Patent has been willful and deliberate, entitling NextCard to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

34. Each Defendant's infringement of NextCard's exclusive rights under the '313 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

## JURY DEMAND

35. Plaintiff demands a trial by jury on all issues.

**PRAYER FOR RELIEF**

Plaintiff NextCard of Texas, L.L.C. respectfully requests this Court to enter judgment in its favor against Defendant, granting the following relief:

A. An adjudication that each Defendant has infringed and continues to infringe claims of the asserted patents;

B. An award of damages to NextCard against each Defendant in an amount adequate to compensate NextCard for each Defendants' acts of infringement together with prejudgment interest;

C. An award to NextCard of enhanced damages, up to and including trebling of NextCard's damages pursuant to 35 U.S.C. § 284, for Defendant's willful infringement;

D. An award of NextCard's costs of suit and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case, or as otherwise permitted by law;

E. A grant of permanent injunction pursuant to 35 U.S.C. § 283, enjoining the Defendant from further acts of infringement; and

F. Any further relief that this Court deems just and proper.

Respectfully submitted,

By: /s/ Donald Puckett

Donald Puckett
State Bar No. 24013358
dpuckett@monts-ware.com
Attorney-in-Charge
Leslie D. Ware
State Bar No. 00785179
lesware@airmail.net
Brent N. Bumgardner
State Bar No. 00795272
bbumgardner@monts-ware.com
Mark W. Born
State Bar No. 24034334
mborn@monts-ware.com

**MONTS & WARE, L.L.P.**
1701 North Market Street, Suite 330
Dallas, Texas 75202-2088
(214) 744-5000
(214) 744-5013 Fax

**ATTORNEYS FOR PLAINTIFF NEXTCARD, LLC**

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NEXTCARD, LLC,<br>Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 2:07-cv-354 (TJW) |
| AMERICAN EXPRESS COMPANY, DFS SERVICES LLC (f/k/a DISCOVER FINANCIAL SERVICES LLC), HSBC NORTH AMERICA HOLDINGS INC., HSBC USA, INC., and THE PNC FINANCIAL SERVICES GROUP, INC.<br>Defendants. | § | JURY TRIAL DEMANDED |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff NextCard, LLC ("Plaintiff" or "NextCard"), by and through its undersigned counsel, files this Complaint against Defendants American Express Company, Discover Financial Services LLC, HSBC North America Holdings, Inc., HSBC USA, Inc. and The PNC Financial Services Group, Inc. as follows:

**NATURE OF THE ACTION**

1. This lawsuit pertains to Defendants' infringement of some or all of the following patents: U.S. Patent No. 6,405,181, titled "Method and Apparatus for Real Time On Line Credit Approval" (the "'181 Patent"); U.S. Patent No. 6,567,791, titled "Method and Apparatus for a Verifiable On Line Rejection of an Application for Credit" (the "'791 Patent"); U.S. Patent No. 7,143,063, titled "Method and Apparatus for a Verifiable On Line Rejection of an Applicant for Credit" (the "'063 Patent"); and U.S. Patent No. 6,718,313, titled "Integrating Live Chat Into an Online Credit Card Application" (the "'313 Patent") (collectively, the "Patents"). Copies of the Patents are attached hereto as Exhibits "A" through "D."

**PARTIES**

2. Plaintiff NextCard, LLC is a limited liability company organized under the laws of the State of Texas, with its principal place of business at 104 E. Houston Street, Suite 145, Marshall, Texas 75670. NextCard is the assignee of all right, title, and interest in and to the Patents.

3.     Defendant American Express Company ("American Express") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 3 World Financial Center, 200 Vesey Street, New York, New York 10285. American Express does business in the State of Texas and in the Eastern District of Texas.  American Express may be served via its registered agent for service of process, CT Corporation System, 111 Eighth Avenue, New York, New York 10011. American Express has appeared and answered in the lawsuit.

4.     Defendant DFS Services LLC (f/k/a Discover Financial Services, LLC) (herein "Discover Financial Services") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 2500 Lake Cook Road, Riverwoods, Illinois 60015.  Discover Financial Services does business in Texas and in the Eastern District of Texas. Discover Financial Services may be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Discover Financial Services has appeared and answered in this lawsuit.

5.     Defendant HSBC North America Holdings, Inc. ("HSBC North American Holdings") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2700 Sanders Road, Prospect Heights, Illinois 60070. HSBC North America Holdings does business in Texas and in the Eastern District of Texas. HSBC North America Holdings may be served via its registered agent

for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

6.    Defendant HSBC USA, Inc. ("HSBC USA") is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 11 East Chase Street, Baltimore, Maryland 21202. HSBC USA does business in Texas in the Eastern District of Texas. HSBC USA may be served via its registered agent for service of process The Corporation Trust Incorporated, 300 E. Lombard Street, Baltimore, Maryland 21202.

7.    Defendant The PNC Financial Services Group, Inc. ("PNC Financial Services") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 1 PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222. PNC Financial Services does business in Texas and in the Eastern District of Texas. PNC Financial Services may be served with process at 1 PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

## JURISDICTION AND VENUE

8.    This action arises under the patent laws of the United States, 35 U.S.C. § *et seq*, including 35 U.S.C. § 271. This Court has subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

9.    The Court has personal jurisdiction over each Defendant. Each Defendant has conducted and does conduct business within the State of Texas. Each Defendant,

directly and/or through intermediaries (including subsidiaries, distributors, third party administrators, etc.), offers for sale, sells, and advertises its products and services in the United States, the State of Texas, and the Eastern District of Texas. Each Defendant, directly and/or through intermediaries, has committed the tort of patent infringement within the State of Texas, and, more particularly, within the Eastern District of Texas.

10. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. §§1391 and 1400(b).

**COUNT I – INFRINGEMENT OF U.S. PATENT 6,405,181**

11. NextCard refers to and incorporates herein the allegations of Paragraphs 1-10 above.

12. The '181 Patent was duly and legally issued by the United States Patent and Trademark Office on June 11, 2002 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '181 Patent and possesses all rights of recovery under the '181 Patent.

13. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '181 Patent by offering credit to consumers via applications that are transmitted over the internet for real-time approval in accordance with the methods and systems claimed in the '181 patent.

14.    NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

15.    Each Defendant's infringement of NextCard's exclusive rights under the '181 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

## COUNT II – INFRINGEMENT OF U.S. PATENT 6,567,791

16.    NextCard refers to and incorporates herein the allegations of Paragraphs 1-15 above.

17.    The '791 Patent was duly and legally issued by the United States Patent and Trademark Office on May 20, 2003 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '791 Patent and possesses all rights of recovery under the '791 Patent.

18.    Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '791 Patent by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '791 Patent.

19. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

20. Each Defendant's infringement of NextCard's exclusive rights under the '791 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT III – INFRINGEMENT OF U.S. PATENT 7,143,063**

21. NextCard refers to and incorporates herein the allegations of Paragraphs 1-20 above.

22. The '063 Patent was duly and legally issued by the United States Patent and Trademark Office on November 28, 2006 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '063 Patent and possesses all rights of recovery under the '063 Patent.

23. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '063 Patent by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '063 Patent.

24. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

25. Each Defendant's infringement of NextCard's exclusive rights under the '063 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT IV – INFRINGEMENT OF U.S. PATENT 6,718,313**

26. NextCard refers to and incorporates herein the allegations of Paragraphs 1-25 above.

27. The '313 Patent was duly and legally issued by the United States Patent and Trademark Office on April 6, 2004, after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '313 Patent and possesses all rights of recovery under the '313 Patent.

28. Defendants American Express, Discover Financial Services, HSBC North America Holdings, and HSBC USA each has infringed and/or continues to infringe the '313 Patent by incorporating online chat features into their internet credit card offerings/applications in accordance with the methods and systems claimed by the '313 Patent.

29.    NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

30.    Each Defendant's infringement of NextCard's exclusive rights under the '313 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

## JURY DEMAND

31.    Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

Plaintiff NextCard of Texas, L.L.C. respectfully requests this Court to enter judgment in its favor against Defendant, granting the following relief:

A.    An adjudication that each Defendant has infringed and continues to infringe claims of the asserted patents;

B.    An award of damages to NextCard against each Defendant in an amount adequate to compensate NextCard for each Defendants' acts of infringement together with prejudgment interest;

C.    An award of NextCard's costs of suit and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case, or as otherwise permitted by law;

D.   A grant of permanent injunction pursuant to 35 U.S.C. § 283, enjoining the

Defendant from further acts of infringement; and

E.   Any further relief that this Court deems just and proper.

Respectfully submitted,


By:     /s/ Donald Puckett
        Donald Puckett
        State Bar No. 24013358
        dpuckett@monts-ware.com
        Attorney-in-Charge
        Leslie D. Ware
        State Bar No. 00785179
        lesware@airmail.net
        Brent N. Bumgardner
        State Bar No. 00795272
        bbumgardner@monts-ware.com
        Mark W. Born
        State Bar No. 24034334
        mborn@monts-ware.com

        **MONTS & WARE, L.L.P.**
        1701 North Market Street, Suite 330
        Dallas, Texas 75202-2088
        (214) 744-5000
        (214) 744-5013 Fax

        Eric M. Albritton
        State Bar No. 00790215
        ema@emafirm.com

        **ALBRITTON LAW FIRM**
        P.O. Box 2649
        Longview, Texas 75601
        (903) 757-8449
        (903) 758-7397 Fax


        **ATTORNEYS FOR PLAINTIFF
        NEXTCARD, LLC**

**CERTIFICATE OF ELECTRONIC SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per LOCAL RULE CV-5(a)(3) today, November 15, 2007. Any other counsel of record will be served by postage paid, certified first class mail, return receipt requested.

/s/ Donald Puckett
Donald Puckett

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **NEXTCARD, LLC,**<br>**Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. 2:07-cv-354 (TJW)** |
| **AMERICAN EXPRESS COMPANY, DFS SERVICES LLC (f/k/a DISCOVER FINANCIAL SERVICES LLC), HSBC NORTH AMERICA HOLDINGS INC., HSBC USA, INC., and THE PNC FINANCIAL SERVICES GROUP, INC.**<br>**Defendants.** | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff NextCard, LLC ("Plaintiff" or "NextCard"), by and through its undersigned counsel, files this Second Amended Complaint against Defendants American Express Company, Discover Financial Services LLC, HSBC North America Holdings, Inc., HSBC USA, Inc. and The PNC Financial Services Group, Inc. as follows:

## NATURE OF THE ACTION

1.    This lawsuit pertains to Defendants' infringement of some or all of the following patents: U.S. Patent No. 6,405,181, titled "Method and Apparatus for Real Time On Line Credit Approval" (the "'181 Patent"); U.S. Patent No. 6,567,791, titled "Method and Apparatus for a Verifiable On Line Rejection of an Application for Credit" (the "'791 Patent"); U.S. Patent No. 7,143,063, titled "Method and Apparatus for a Verifiable On Line Rejection of an Applicant for Credit" (the "'063 Patent"); U.S. Patent No. 6,718,313, titled "Integrating Live Chat Into an Online Credit Card Application" (the "'313 Patent"); and U.S. Patent No. 7,346,576 titled "Integrating Live Chat Into an Online Credit Card Application" (the '576 Patent) (collectively, the "Patents"). Copies of the Patents are attached hereto as Exhibits "A" through "E."

## PARTIES

2.    Plaintiff NextCard, LLC is a limited liability company organized under the laws of the State of Texas, with its principal place of business at 104 E. Houston Street, Suite 145, Marshall, Texas 75670. NextCard is the assignee of all right, title, and interest in and to the Patents.

3. Defendant American Express Company ("American Express") is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 3 World Financial Center, 200 Vesey Street, New York, New York 10285. American Express does business in the State of Texas and in the Eastern District of Texas. American Express may be served via its registered agent for service of process, CT Corporation System, 111 Eighth Avenue, New York, New York 10011. American Express has appeared and answered in the lawsuit.

4. Defendant DFS Services LLC (f/k/a Discover Financial Services, LLC) (herein "Discover Financial Services") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 2500 Lake Cook Road, Riverwoods, Illinois 60015. Discover Financial Services does business in Texas and in the Eastern District of Texas. Discover Financial Services may be served via its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Discover Financial Services has appeared and answered in this lawsuit.

5. Defendant HSBC North America Holdings, Inc. ("HSBC North American Holdings") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 2700 Sanders Road, Prospect Heights, Illinois 60070. HSBC North America Holdings does business in Texas and in the Eastern District of Texas. HSBC North America Holdings may be served via its registered agent

for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. HSBC North American Holdings has appeared and answered in this lawsuit.

6. Defendant HSBC USA, Inc. ("HSBC USA") is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 11 East Chase Street, Baltimore, Maryland 21202. HSBC USA does business in Texas in the Eastern District of Texas. HSBC USA may be served via its registered agent for service of process The Corporation Trust Incorporated, 300 E. Lombard Street, Baltimore, Maryland 21202. HSBC USA has appeared and answered in this lawsuit.

7. Defendant The PNC Financial Services Group, Inc. ("PNC Financial Services") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 1 PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222. PNC Financial Services does business in Texas and in the Eastern District of Texas. PNC Financial Services may be served with process at 1 PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222. PNC Financial Services has appeared and answered in this lawsuit.

## JURISDICTION AND VENUE

8. This action arises under the patent laws of the United States, 35 U.S.C. § *et seq.*, including 35 U.S.C. § 271. This Court has subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

9. The Court has personal jurisdiction over each Defendant. Each Defendant has conducted and does conduct business within the State of Texas. Each Defendant, directly and/or through intermediaries (including subsidiaries, distributors, third party administrators, etc.), offers for sale, sells, and advertises its products and services in the United States, the State of Texas, and the Eastern District of Texas. Each Defendant, directly and/or through intermediaries, has committed the tort of patent infringement within the State of Texas, and, more particularly, within the Eastern District of Texas.

10. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. §§1391 and 1400(b).

**COUNT I – INFRINGEMENT OF U.S. PATENT 6,405,181**

11. NextCard refers to and incorporates herein the allegations of Paragraphs 1-10 above.

12. The '181 Patent was duly and legally issued by the United States Patent and Trademark Office on June 11, 2002 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '181 Patent and possesses all rights of recovery under the '181 Patent.

13. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '181 Patent by offering credit to consumers via applications that

are transmitted over the internet for real-time approval in accordance with the methods and systems claimed in the '181 patent.

14.    NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

15.    Each Defendant's infringement of NextCard's exclusive rights under the '181 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

## COUNT II – INFRINGEMENT OF U.S. PATENT 6,567,791

16.    NextCard refers to and incorporates herein the allegations of Paragraphs 1-15 above.

17.    The '791 Patent was duly and legally issued by the United States Patent and Trademark Office on May 20, 2003 after full and fair examination.  NextCard is the assignee of all rights, title, and interest in and to the '791 Patent and possesses all rights of recovery under the '791 Patent.

18.    Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '791 Patent by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '791 Patent.

19. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

20. Each Defendant's infringement of NextCard's exclusive rights under the '791 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT III – INFRINGEMENT OF U.S. PATENT 7,143,063**

21. NextCard refers to and incorporates herein the allegations of Paragraphs 1-20 above.

22. The '063 Patent was duly and legally issued by the United States Patent and Trademark Office on November 28, 2006 after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '063 Patent and possesses all rights of recovery under the '063 Patent.

23. Defendants American Express, Discover Financial Services, HSBC North America Holdings, HSBC USA, and PNC Financial Services each has infringed and continues to infringe the '063 Patent by presenting credit applicants with reasons for rejection of the credit application in accordance with the methods and systems claimed by the '063 Patent.

24. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

25. Each Defendant's infringement of NextCard's exclusive rights under the '063 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT IV – INFRINGEMENT OF U.S. PATENT 6,718,313**

26. NextCard refers to and incorporates herein the allegations of Paragraphs 1-25 above.

27. The '313 Patent was duly and legally issued by the United States Patent and Trademark Office on April 6, 2004, after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '313 Patent and possesses all rights of recovery under the '313 Patent.

28. Defendants American Express, Discover Financial Services, HSBC North America Holdings, and HSBC USA each has infringed and/or continues to infringe the '313 Patent by incorporating online chat features into their internet credit card offerings/applications in accordance with the methods and systems claimed by the '313 Patent.

29. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

30. Each Defendant's infringement of NextCard's exclusive rights under the '313 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**COUNT V – INFRINGEMENT OF U.S. PATENT 7,346,576**

31. NextCard refers to and incorporates herein the allegations of Paragraphs 1-30 above.

32. The '576 Patent was duly and legally issued by the United States Patent and Trademark Office on March 18, 2008, after full and fair examination. NextCard is the assignee of all rights, title, and interest in and to the '576 Patent and possesses all rights of recovery under the '576 Patent.

33. Defendants Discover Financial Services, HSBC North America Holdings, and HSBC USA each has infringed and/or continues to infringe the '576 Patent by incorporating online chat features into their internet credit card offerings/applications in accordance with the methods and systems claimed by the '576 Patent.

34. NextCard is entitled to recover from each Defendant the damages sustained by NextCard as a result of Defendant's wrongful acts in an amount subject to proof at trial.

35. Each Defendant's infringement of NextCard's exclusive rights under the '576 Patent will continue to damage NextCard's business, causing irreparable harm for which there is no adequate remedy at law, unless it is enjoined by this Court.

**JURY DEMAND**

36. Plaintiff demands a trial by jury on all issues.

**PRAYER FOR RELIEF**

Plaintiff NextCard of Texas, L.L.C. respectfully requests this Court to enter judgment in its favor against Defendant, granting the following relief:

A. An adjudication that each Defendant has infringed and continues to infringe claims of the asserted patents;

B. An award of damages to NextCard against each Defendant in an amount adequate to compensate NextCard for each Defendants' acts of infringement together with prejudgment interest;

C. An award of NextCard's costs of suit and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case, or as otherwise permitted by law;

D. A grant of permanent injunction pursuant to 35 U.S.C. § 283, enjoining the Defendant from further acts of infringement; and

E. Any further relief that this Court deems just and proper.

Respectfully submitted,


By:     /s/ Donald Puckett
          Donald Puckett
          State Bar No. 24013358
          dpuckett@monts-ware.com
          Attorney-in-Charge
          Leslie D. Ware
          State Bar No. 00785179
          lesware@airmail.net
          Mark W. Born
          State Bar No. 24034334
          mborn@monts-ware.com
          **THE WARE FIRM**
          1701 North Market Street, Suite 330
          Dallas, Texas 75202-2088
          (214) 744-5000
          (214) 744-5013 Fax

          Brent N. Bumgardner
          State Bar No. 00795272
          bbumgardner@nbclaw.net
          **NELSON BUMGARDNER CASTO, P.C.**
          5601 Bridge Street, Suite 300
          Fort Worth, Texas 76122
          Telephone: 817-377-3490
          Facsimile: 817-377-3485

          Eric M. Albritton
          State Bar No. 00790215
          ema@emafirm.com
          **ALBRITTON LAW FIRM**
          P.O. Box 2649
          Longview, Texas 75601
          (903) 757-8449
          (903) 758-7397 Fax

          **ATTORNEYS FOR PLAINTIFF**

          **NEXTCARD, LLC**

**CERTIFICATE OF ELECTRONIC SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per LOCAL RULE CV-5(a)(3) today, April 9, 2008. Any other counsel of record will be served by postage paid, certified first class mail, return receipt requested.

/s/ Donald Puckett
Donald Puckett

# TAB A



US006405181B2

# (12) United States Patent
Lent et al.

(10) Patent No.: **US 6,405,181 B2**
(45) Date of Patent: ***Jun. 11, 2002**

(54) **METHOD AND APPARATUS FOR REAL TIME ON LINE CREDIT APPROVAL**

(75) Inventors: **Jeremy R. Lent**; **Mary Lent**, both of Corte Madera; **Eric R. Meeks**, San Francisco; **Yinzi Cai**, Fremont; **Timothy J. Coltrell**, Danville; **David W. Dowhan**, Mountain View, all of CA (US)

(73) Assignee: **NextCard, Inc.**, San Francisco, CA (US)

( * ) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/185,201**

(22) Filed: **Nov. 3, 1998**

(51) **Int. Cl.**[7] .................................. **G06F 17/60**
(52) **U.S. Cl.** .................................. **705/38**
(58) **Field of Search** .................. 705/14, 35, 38, 705/39, 505–508

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,187,735 A | | 2/1993 | Garcia et al. | 379/88.17 |
| 5,239,462 A | | 8/1993 | Jones et l. | 705/38 |
| 5,262,941 A | * | 11/1993 | Saladin et al. | 705/38 |
| 5,387,783 A | * | 2/1995 | Mihm et al. | 235/375 |
| 5,450,537 A | * | 9/1995 | Hirai et al. | 707/507 |
| 5,611,052 A | * | 3/1997 | Dykstra et al. | 705/38 |
| 5,696,907 A | * | 12/1997 | Tom | 705/38 |
| 5,704,029 A | * | 12/1997 | Wright, Jr. | 707/505 |
| 5,727,163 A | | 3/1998 | Bezos | 705/27 |
| 5,745,654 A | | 4/1998 | Titan | 706/20 |
| 5,761,640 A | * | 6/1998 | Kalyanaswamy et al. | 704/260 |
| 5,774,882 A | | 6/1998 | Keen et al. | 705/38 |
| 5,774,883 A | * | 6/1998 | Andersen et al. | 705/38 |
| 5,797,133 A | * | 8/1998 | Jones et al. | 705/38 |
| 5,819,029 A | * | 10/1998 | Edwards et al. | 713/200 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0840244 A1 | * | 5/1998 | |
| WO | WO 97/22073 | | 6/1997 | G06F/17/60 |

OTHER PUBLICATIONS

Anon., "VAR Agreement Expands Credit Bureau Access," Computers in Banking, Oct. 1989, vol. 6, No. 10, p. 58.*

Wortmann, H.S., Outsourcing: An Option Full of Benefits and Responsibilities, American Banker, Oct. 24, 1994, vol. 159, No. 205, p. 7A.*

Stetenfeld, B., "Credit Scoring: Finding the Right Recipe," Credit Union Management, vol. 17, No. 11, pp. 24–26, Nov. 1994.*

Friedland, M., "Credit Scoring Digs Deeper into Data," Credit World, vol. 84, No. 5, pp. 19–23, May/Jun. 1996.*

Lotus press release, "Lotus Delivers Pre–RElease of Lotus Notes 4.6 Client Provides Compelling New Integration with Internet Explorer," May 20, 1997.*

(List continued on next page.)

*Primary Examiner*—Wynn Coggins
*Assistant Examiner*—Nicholas David Rosen
(74) *Attorney, Agent, or Firm*—Van Pelt & Yi LLP

(57) **ABSTRACT**

A system and method are disclosed for providing real time approval of credit over a network. The method includes obtaining applicant data from an applicant. The applicant data is analyzed into a form suitable for directly obtaining a credit report from a credit bureau for the applicant. A credit report having credit report data is obtained from a credit bureau for the applicant. It is then determined whether to accept the applicant using the credit report data and it is communicated to the applicant that the applicant has been approved.

**4 Claims, 19 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,819,236 A | * | 10/1998 | Josephson | 705/35 |
| 5,819,291 A | * | 10/1998 | Haimowitz et al. | 707/201 |
| 5,832,465 A | | 11/1998 | Tom | 706/51 |
| 5,870,721 A | | 2/1999 | Norris | 705/38 |
| 5,878,403 A | * | 3/1999 | DeFrancesco et al. | 705/38 |
| 5,911,135 A | | 6/1999 | Atkins | 705/36 |
| 5,930,776 A | * | 7/1999 | Dykstra et al. | 705/38 |
| 5,940,811 A | * | 8/1999 | Norris | 705/38 |
| 5,940,812 A | * | 8/1999 | Tengel et al. | 705/38 |
| 5,950,179 A | | 9/1999 | Buchanan et qal. | 705/38 |
| 5,960,411 A | * | 9/1999 | Hartman et al. | 705/26 |
| 5,966,699 A | * | 10/1999 | Zandi | 705/38 |
| 5,970,478 A | * | 10/1999 | Walker et al. | 705/35 |
| 5,987,434 A | | 11/1999 | Libman | 705/36 |
| 5,995,947 A | * | 11/1999 | Fraser et al. | 705/38 |
| 6,014,645 A | * | 1/2000 | Cunningham | 705/38 |
| 6,029,149 A | * | 2/2000 | Dykstra et al. | 705/38 |
| 6,029,890 A | | 2/2000 | Austin | 235/380 |
| 6,088,686 A | * | 7/2000 | Walker et al. | 705/38 |
| 6,112,190 A | * | 7/2000 | Fletcher et al. | 705/38 |
| 6,105,007 A | * | 8/2000 | Norris | 705/38 |
| 6,119,103 A | | 9/2000 | Basch et al. | 705/35 |
| 6,182,124 B1 | * | 1/2001 | Lau et al. | 709/217 |
| 6,192,380 B1 | * | 2/2001 | Light et al. | 707/505 |
| 6,199,079 B1 | * | 3/2001 | Gupta et al. | 707/507 |
| 6,202,053 B1 | * | 3/2001 | Christiansen et al. | 705/38 |
| 6,208,979 B1 | | 3/2001 | Sinclair | 705/38 |
| 6,272,506 B1 | * | 8/2001 | Bell | 707/507 |
| 6,289,319 B1 | * | 9/2001 | Lockwood | 705/35 |
| 6,311,169 B2 | * | 10/2001 | Duhon | 705/38 |
| 2001/0011246 A1 | * | 8/2001 | Tammaro | 705/38 |
| 2001/0011282 A1 | * | 8/2001 | Katsumata et al. | 707/505 |
| 2001/0014877 A1 | * | 8/2001 | DeFrancesco, Jr. et al. | 705/38 |

OTHER PUBLICATIONS

Hollander, G., "Sibling Tool Personator 3 Untangles File Formats," InfoWorld, vol. 20, No. 5, p. 102, Feb. 2, 1998.*
Anon., "Microsoft Targets More Than PIM Market with Outlook 2000, " Computer Reseller News, No. 805, p. 99, Aug. 31, 1998.*
List of Web pages from Altavista, http://www.altavista.com/cgi-bin/query?pg=q&stype =stext&sc=on &q=FICO&stq=10, Nov. 4, 1999.*
"What Do FICO Credit Scores Mean to Me?" www.sancap-.com/sis/FICO%20SCORE.htm, May 30, 1998.*
"What Is a FICO Score?" www.aspenloan.com/FICO score.htm, Sep. 30, 1998.*
"FICO," houseloans.idis.com/fico.htm, Oct. 2, 1998.*
The New Encyclopedia Britannica, 15th Edition, vol. 3 (Micropaedia), p. 722, "credit bureau", 1994.*
"To Boost Balances, AT&T Renews No-Fee Universal Credit Card Offer," The report on AT&T, v.10, n.13, Mar. 30, 1992.
Anon. "Citgo Puts on new spin on the cobranded oil card," Credit Card News, p. 4, Nov. 1, 1995.
Anon, What the Credit Bureau is saying about you: if a mistake sneaks into your record, you may not know about it until you get turned down for credit, Changing Times, v. 37, p. 56, Jul. 1983

Block, Valerie, "Network Assembles Card Issuers at an Internet Site," American Banker, vol. 160, No. 198, p. 11, Oct. 13, 1995.

Borowsky, Mark, "The Neural Net: Predictor of Fraud or Victim of Hype?" Bank Technology News, p. 7, Sep. 1993.

Chesanow, Neil, "Pick the Right Credit Cards–and Use Them Wisely", Medical Economics, v75, n16, p. 95(5), Aug. 24, 1998.

Creditnet, http://consumers.creditnet.com/.

Kantrow, Yvette D., "Banks Press Cardholders to Take Cash Advances", Amnerican Bankler, v 157, n18, p. 1, Jan. 28, 1992.

McCormick, Linda W., "Users of Credit Scoring Face Tough Rules on Notification", American Banker, p. 1 May 21, 1982.

McShane, Peter K., "Got Financing?", Business Journal Serving Southern Tier, vol. 11, Issue 19 p. 9.

Creditnet.com–An Online Guide to Credit Cards; http://www.creditnet.com/consumers.html.

Canter, Ronald S., "Lender Beware–Federal Regulation of Consumer Credit", Credit World, vol. 81, No. 5, pp. 16–20, May 1993.

Staff, "On–Line System Approves Loans While Customer Waits", Communication News, vol. 31, No. 9, Sep. 1994.

"Low–Rent Loan Officer In a Kiosk", Bank Technology News, vol. 8, No. 2, p. 5, Feb. 1995.

Duclaux, Denise, "A Check for $5,000 in Ten minutes", ABA Banking Journal, vol. 87, No. 8 p. 45, Aug. 1995.

"World Wide Web Enhances Customer's Choice", Cards International, No. 143, p. 9, Nov. 1995.

"Wells Fargo Launches First Real–Time, Online Home Equity Credit Decision–Making Service", Business Wire, Jun. 1998, Dialog File 621: New Product Announcement.

Handley, John, "Credit Review Lets the Numbers Do the Talking in Home Mortgage Game", Chicago Tribune, Jul. 1998.

Sherman, Lee, "Wells Fargo Writes a New Online Script", Interactive Week, vol. 5, No. 31, p. 29, Aug. 1998.

FIData, Inc., Press Release, Aug. 26, 1998, http://fidata-inc.com.

"Network Assembles Card Issuers at an Internet site.", Block Valerie, *American Banker*, v160, n. 198, p. 11.

"Phillips 66 Introduces Mastercard with Rebate Feature", PR Newswire, Sep. 14, 1995.

Calvery, Mark, "Internet Gives Bankers a Snappy Comeback", San Francisco Business Times, vol. 13, No. 5, p. 3, Sep. 1998.

Press Release, Aug. 26, 1998, FIData, Inc., http://fidata-inc.com.

* cited by examiner



102
Application Engine
104
Address Parser
106
Validator
108
Underwriter
110
Creditor
112
Application Object Loader
114

FIG. 1



202
204
Application
222
Offers
220
Status
218
FDR Data
214
Credit Report
216
Attribute
Attribute
Attribute
...
Attribute
206
Applicant
208
Data element
210
Test result objects
212
Validation Status

FIG. 2



300
START
304
Get applicant data
306
Validate applicant data
308
Valid applicant ?
N
309
Display and edit data
Y
Display fields and edit data
310
N
Parsing of data correct
311
Y
312
Pre-credit bureau tests
Fail
313
Status rejected
Pass
Bureau tests
Fail
Status rejected
315
314
Pass
Post-Bureau tests
316
320
END

FIG. 3



306
Start
Validate address
402
Store test result
404
Validate phone #
406
Store test result
408
Validate soc. sec. #
410
Store test result
412
420
End

FIG. 4A



450
START
452
Split address into fields
454
Display parsing result
Parsing result correct?
N
Edit fields
Y
456
458
Send data to Underwriter
460
END
462

FIG. 4B



312
500
START
502
Obtain Income
504
Minimum Income?
N
506
Decline
Y
Obtain Age
508
510
Minimum Age?
N
512
Decline
Y
Duplicate Application?
514
Y
518
Decline
N
516
Exceed duplicate period?
Y
520
END

FIG. 5



314
600
START
602
Perform first bureau test
Fail
604
Reject
606
END
Not fail
608
Perform second bureau test
Fail
Not fail
612
Two bureau tests passed?
Y
614
Accept
N
616
One bureau test passed?
N
618
Reject for too few reports
620
Y
Not Found
Perform third bureau test
Fail
622
Reject
Pass
624
Accept

FIG. 6A



602
650
START
652
Request credit report
Perform attribute tests
656
Perform credit report specific tests
658
662
Reject
Fail
Pass?
660
Note Pass
664
670
END

FIG. 6B



680
START
682
Check FICO Store
Below Threshold
684
Reject
Above Threshold
Check other attributes
688
690
Any attribute tests filed?
Y
N
Accept
692
694
END

FIG. 6C



700
START
702
Check status from Underwriter
rejected
duplicate
credit bureau error
accepted
704
Execute rejection process
706
Display Duplicate Message
Display Bureau error Message
Execute offer process
708
710
714
Provide link to re-entry screen
Provide link to error report site
712
720
END

FIG. 7



800
START
802
Determine FICO factors
804
Map FICO code to internal code
806
General Reason?
Y
N
808
Get results of Attribute tests
814
Reason = mapped reason
816
Attribute tests map to a reason?
Reason = General reason
Y
810
Reason = Attribute reason
812
Display reason
818
820
END

FIG. 8A

| External Code | Internal Code | Internal decline reason |
|---|---|---|
| E1 | I1 | General reason |
| E2 | I1 | General reason |
| E3 | I1 | General reason |
| E4 | I4 | Specific reason |
| E5 | I5 | Specific reason |

*FIG. 8B*



900
START
Get reason denied
902
Display reason denied
904
Display link to credit counseling
906
Display acknowledgment button
908
910
Acknowledgment button activated?
Y
912
Mark application rejection acknowledged
N
914
Mark application rejection not acknowledged
END
916

FIG. 9



1000
START
1002
Retrieve application object
Obtain offer selection criteria from credit report object
1004
Derive a set of offers from credit report data and applicant information
1006
Display set of offers
1008
Note selected offer and balance tranfer
1010
Get balance transfer amount
1012
Assemble data file for FDR
1014
1016
END

FIG. 10A



FIG. 10B

FIG. 10C

| FICO range (1108) | Income range (1110) | Balance Transfer (1112) | Offer 1 (1114) | Offer 2 (1116) | Offer 3 (1118) | Offer 4 (1120) |
|---|---|---|---|---|---|---|
| 500-550 | 40,000-45,000 | 1000 | Link1 | Link2 | Link3 | Link4 |
| 551-600 | 35,000-40,000 | 750 | Link1 | Link2 | Link3 | Link4 |
| 601-650 | 46,000-50,000 | 500 | Link1 | Link2 | Link3 | Link4 |
| . | . | . | . | . | . | . |
| : | : | : | : | : | : | : |
| ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ | ⋮ |

FIG. 11

1202

1212

| 1204 | Rate (1214) | Annual Fee (1216) | Credit Limit (1218) | Required Balance Transfer (1220) |
|---|---|---|---|---|
| Offer 1 | 5.9% | 0 | 20,000 | 12,000 |
| Offer 2 (1206) | 6.9% | 0 | 15,000 | 8,000 |
| Offer 3 (1208) | 8.9% | 0 | 10,000 | 4,000 |
| Offer 4 | 14.9% | 20 | 5,000 | 0 |

1210

FIG. 12



1300
START
Retrieve accounts and balances
1302
1304
Display estimated balances and identify accounts
Partial # exit selected
1306
transfer indicated
Obtain user balance tranfers
1316
Return to offer selection screen
1307
N
Are balance transfers greater than or equal to required transfer?
Y
1308
Request final confirmation
1310
Confirmed?
N
Y
Execute balance transfers
1312
1314
END

FIG. 13



1402
Applicant host system
1404
Internet
1406
Web Server
Business Logic Server
1408

FIG. 14

# METHOD AND APPARATUS FOR REAL TIME ON LINE CREDIT APPROVAL

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to electronic commerce. More specifically, the invention relates to methods and apparatuses for providing real time credit approval to an applicant online by obtaining data from an applicant, verifying and formatting the data so obtained in a manner that permits accessing the applicant's credit report, and making an underwriting decision to grant or deny credit to the applicant in real time based on data from one or more credit bureau reports.

2. Relationship to the Art

With the advent of electronic commerce on the Internet, applicants have begun to expect decisions that have historically required a period of days or weeks to be made instantly when processed on line. Numerous transactions such as purchases of consumer goods, airline tickets, and movie tickets have been adapted for execution on line in a matter of seconds. What has not been perfected is the ability to make a credit decision and grant credit to a party on line in real time. (For the purpose of this specification, "instant" or "real time" credit means within a short period of time within less than about five minutes.) As a result, virtually all Internet commerce to date requires some previously secured method of payment such as a credit card obtained by conventional means or other previously arranged payment source such as a bank account or electronic money.

One factor that has prevented Internet applicants from providing information and receiving instant approval for credit is the difficulty of interfacing with the various credit bureau databases (Equifax, Trans Union, and Experian). Personal information must be entered by a party authorized by the credit bureaus to communicate with the credit bureaus for the purpose of accessing credit bureau reports. Such information must be in exactly the correct form in order for an individual's credit report to be retrieved. Another difficulty has been that the decision to grant credit carries with it significant risk and systems have not been successfully designed that can make a sufficiently reliable underwriting decision using data provided directly by an applicant.

Many credit card issuers provide applications on line that may be filled out by applicants. However, data from those applications must be entered manually into the credit card issuer's system for processing before a credit report is obtained and an underwriting decision can be made. Other applicants may be preapproved by an existing card issuer's system before an offer is made and accepted online. However, the underwriting process has not been sufficiently automated to allow a credit decision to be made in real time for an applicant who has entered personal data into an application system.

What is needed is a system and method for obtaining personal data from a credit applicant, parsing the data into a format that is compatible with that used by the credit bureaus, obtaining credit bureau information and making an underwriting decision in real time. Such a system would be useful for conveniently obtaining a credit card on line. Automation of a process for obtaining a credit report and making an underwriting decision without human intervention would be beneficial because credit approval decisions could be made faster and more cheaply. The true power of such a system would be realized when the system is accessed in the midst of a transaction to obtain credit specifically for the purpose of that transaction.

## SUMMARY OF THE INVENTION

The present invention provides a system and method for obtaining information from an applicant, accessing credit bureau information and making a real time underwriting decision to accept or reject the applicant. A parsing engine parses the information provided by the applicant so that it may be sent directly to a credit bureau. Information obtained from one or more credit bureaus is used by an underwriter engine to make a decision whether to grant credit to the applicant.

It should be appreciated that the present invention can be implemented in numerous ways, including as a process, an apparatus, a system, a device, a method, or a computer readable medium. Several inventive embodiments of the present invention are described below.

In one embodiment, a method of providing real time approval of credit over a network is disclosed. The method includes obtaining applicant data from an applicant. The applicant data is analyzed into a form suitable for directly obtaining a credit report from a credit bureau for the applicant. A credit report having credit report data is obtained from a credit bureau for the applicant. It is then determined whether to accept the applicant using the credit report data and it is communicated to the applicant that the applicant has been approved.

These and other features and advantages of the present invention will be presented in more detail in the following specification of the invention and the accompanying figures which illustrate by way of example the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

FIG. 1 is a block diagram illustrating a preferred architecture for a system that provides instant on-line credit card approval.

FIG. 2 is a block diagram illustrating an application data structure that is used in one embodiment to store the data contained in an application and to keep track of the status of the application as it progresses through the various modules described in FIG. 1.

FIG. 3 is a flow chart illustrating the general process flow through the modules of FIG. 1.

FIG. 4A is a flow chart illustrating a validation process that is used in step according to one embodiment of the invention.

FIG. 4B is a flow chart illustrating a process for parsing an address entered by an applicant.

FIG. 5 is a flow chart illustrating a pre-credit bureau test performed in one embodiment of the invention.

FIG. 6A is a flow chart illustrating a process for making an underwriting decision using multiple credit reports.

FIG. 6B is a flow chart illustrating a process implemented on the Underwriter for using credit bureau data to accept or reject an applicant in one embodiment.

FIG. 6C is a flow chart illustrating a process for using the FICO score combined with other attributes to accept or reject an applicant.

FIG. 7 is a flow chart illustrating a process for checking the status of an application and executing either an offer process or one of several rejection processes.

FIG. 8A is a flow chart illustrating a process for determining an appropriate reason to display for rejecting an applicant and displaying that reason.

FIG. 8B is a diagram illustrating one data structure used to map main FICO factors provided by the credit bureau (referred to as external codes) to internal decline codes as well as reasons for rejection to be provided to rejected applicants.

FIG. 9 is a flow chart illustrating how a rejection reason may be obtained.

FIG. 10A is a flowchart illustrating a process for providing a set of multiple offers to an applicant and receiving a balance transfer amount corresponding to an offer selected by the applicant.

FIG. 10B is a flow chart illustrating one such method of deriving a credit limit for an applicant based on the applicant's FICO score and income, as well as the amount of total revolving balance that the applicant elects to transfer.

FIG. 10C is a table showing how an applicant's credit limit is determined from the applicant's FICO score and balance transfer amount.

FIG. 11 is another data representation illustrating another embodiment of how the offers may be determined based on FICO score, income range, income, and total revolving balance transfer.

FIG. 12 is a diagram illustrating a display provided to the applicant for the purpose of presenting multiple offers to the applicant.

FIG. 13 is a flow chart illustrating a process for obtaining a real-time balance transfer from an applicant.

FIG. 14 is a block diagram illustrating one computer network scheme that may be used to implement the system described herein.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Reference will now be made in detail to the preferred embodiment of the invention. An example of the preferred embodiment is illustrated in the accompanying drawings. While the invention will be described in conjunction with that preferred embodiment, it will be understood that it is not intended to limit the invention to one preferred embodiment. On the contrary, it is intended to cover alternatives, modifications, and equivalents as may be included within the spirit and scope of the invention as defined by the appended claims. In the following description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. The present invention may be practiced without some or all of these specific details. In other instances, well known process operations have not been described in detail in order not to unnecessarily obscure the present invention.

FIG. 1 is a block diagram illustrating a preferred architecture 102 for a system that provides instant on-line credit card approval. As shown, an application engine 104 creates an application by prompting an applicant for data and storing the entered data. In one embodiment, the application engine creates an application by communicating with the applicant over the World Wide Web using Java, html or other commonly used Internet protocols. In other embodiments, other types of connections may be established between the applicant and the application engine. The application includes applicant data such as the applicant's address and social security number. Once created, the application is received by the parsing engine 106 which parses an applicant's name and address and creates appropriate software objects.

The parsing engine 106 parses the data into an exact format that may be used to directly access credit bureau data. The applicant is given an opportunity to view how the data submitted has been parsed and to make corrections to parsed data, if necessary. The parsing engine 106 is described in further detail in FIG. 4B. The parsed data is passed to a Validator 108. Validator 108 validates certain data entered by the applicant such as the social security number and zip code. Validation may include checking either the form of a number to ensure that the correct number of digits have been entered or checking content such as checking that the area code portion of a phone number is a valid area code or checking that a zip code matches a city. If the data is determined to be valid, then the validated data is input to an Underwriter 110. It is important to avoid sending invalid data to the Underwriter to avoid the cost of requesting credit reports that cannot be used.

Underwriter 110 receives data from the parsing engine and evaluates the data to determine if the applicant should receive an offer for credit. In one embodiment, the Underwriter sends the parsed data to at least two credit bureaus, receives data from the credit bureaus, and makes an underwriting decision based on an analysis of the credit bureau data. The analysis may include, but is not limited to, comparing the applicant's Fair Isaac Risk Score (FICO score) to certain thresholds. Underwriter 110 is described in further detail in FIGS. 6A and 6B. If the Underwriter determines that an offer of credit should be extended to the applicant, then an offer is made in real time to the applicant. As is described below, the offer may include one or more sets of alternative terms and those terms may be conditioned on the applicant taking certain actions such as transferring balances. The applicant may be required to actually take such actions in real time before an offer conditioned on such actions is confirmed. If the Underwriter determines that no offer of credit should be extended, then the Underwriter determines a reason for rejecting the applicant.

Whether an offer is extended and accepted or not, information about the offer or the rejection is passed to a creditor module 112 that finalizes the offer and builds a data file that is in the proper form to be sent to First Data Resources, Inc. (FDR), or another such entity that provides a similar service to FDR's service. During the finalization of the offer, FDR data is built for all approved and declined applications. FDR handles the embossing of the card and delivering it to approved applicants. FDR also handles sending rejection letters to rejected applicants.

If, at any time during the process, a system error occurs that interrupts the process, then an application object loader 114 loads the appropriate application for reentry into the system. It should be noted that in one embodiment, the data that is processed and stored by each module is stored as an application object as is described further in FIG. 2. In other embodiments, the data is stored in other ways, such as in a table or in a database.

FIG. 2 is a block diagram illustrating an application data structure 202 that is used in one embodiment to store the data contained in an application and to keep track of the status of the application as it progresses through the various modules described in FIG. 1. It should be noted that other data structures may be used in other embodiments within the scope of this invention. Application data structure 202 includes an application object 204 that is created by the application engine. Application object 204 points to a number of associated data structures, including an applicant object 206. Applicant object 206 stores applicant data and includes one or more data elements 208. For example, an

applicant data element **208** may include information such as the applicant's address, phone number, or social security number. The application data structure also includes one or more test result objects **210**. Each test result object **210** stores a validation status **212** associated with a validation test applied to the data associated with applicant object **206**. For example, a test result object may include a social security number status indicating whether the social security number entered by the applicant is a valid social security number. Also, a test result object **210** may include a zip code status indicating whether the zip code entered by the applicant matches the rest of the address entered by the applicant. Test result objects are used to check whether data entered by the applicant is valid before certain actions are taken, such as a credit report being ordered.

The application data structure further includes a set of credit report objects **214** associated with each credit report ordered. In one embodiment, the Underwriter requires at least two credit reports from two of three credit bureaus before a decision to grant credit is made. This rule effectively enables a real time credit decision to be made without incurring an unacceptable amount of risk. Since credit reports are preferably ordered from more than one credit bureau, the application data structure will likely include several credit report objects. Each credit report object **214** includes a plurality of attributes **216**. An attribute is an item of data provided by the credit bureau in the credit report. For example, one such attribute is a 90 day attribute that indicates the number of times that the applicant has been more than 90 days late in payment of a debt. Similarly, a 60 day attribute may be provided. Other attributes may include a FICO score, the number of times the applicant has been severely delinquent, existence of a derogatory public record, whether the applicant is now delinquent, the applicant's total revolving balance, and the amount of time that a credit report has been on file for the applicant (also referred to as "thickness of file" or "time on file."

As is described below, in one embodiment, the Underwriter bases its decision on the FICO score alone when the FICO score is below a rejection threshold. In some embodiments, there may be automatic approval when the FICO score is above an approval threshold.

The application data structure further includes FDR data object **218** associated with the application. FDR data is created by the creditor module for the purpose of sending application information to FDR so that FDR may send credit cards to successful applicants and send rejections to unsuccessful applicants, when that is required.

The application object also includes a status object **220**. The status of the application object is determined at various times by the modules. For example, the Validator module may determine that the application is invalid based on an invalid social security number or zip code. The Underwriter module may also determine that the application is a duplicate, as will be described below. The Underwriter may also change the status of an application to accepted or declined. In addition, certain applications may be tagged with a fraud status flag indicating that there is a likelihood of fraud. The application data structure also may include a set of offers **222** to be provided to the applicant.

Thus far, the software architecture and data structure used to make a real time credit decision in one embodiment have been described. Next, the processes implemented in the modules will be described.

FIG. **3** is a flow chart illustrating the general process flow through the modules of FIG. **1**. The process starts at **300**. In a step **304**, applicant data is obtained via html, Java or other suitable network protocol. It should be noted that in different embodiments, the information entered by the applicant may be either parsed first by the parsing engine or validated first by the Validator. For the purpose of illustrating this point, FIG. **3** shows Validation occurring first in a step **306**. FIG. **1** alternatively shows the parsing engine operating first. If the information is not valid, then control is transferred from a step **308** to a step **309** and the applicant is given an opportunity to edit the data. The Validator then rechecks the edited data.

If the information is valid, then control is transferred to a step **310** where the data entered is displayed along with the field assigned to each part of the data by the parsing engine. This step is important to ensure that the data will be readable when it is sent to a credit bureau by the Underwriter. An exact match is required by the credit bureaus for the correct credit report to be sent. Various ambiguities in the way that an address may be expressed can cause difficulties. Such difficulties have been a significant factor in preventing other systems from allowing individuals to directly access credit bureau data. For example, it is necessary to distinguish a street direction that is part of a street address from a street name that happens to be a direction, such as "North."

To make certain that such distinctions as well as other distinctions are made correctly, the parsing engine categorizes each part of the entered address and presents the field names along with that portion of the address that it has assigned to each field name. So, for example, the applicant can move "North" from a street direction field to a street name field if that is appropriate. Thus, by parsing the address and assigning the different parts to fields and then allowing the applicant to check and edit the assignment, the parsing engine enables applicants with no knowledge of the Byzantine structure required by the credit bureaus to enter personal data in a manner that allows a credit report to be obtained without human intervention.

Initial parsing is achieved by analyzing the form of the address and dividing, for example, the street number, street name, city and state. However, regardless of the care taken in designing initial parsing, some miscategorization will likely occur. Displaying the parsing to the applicant and allowing the applicant to correct parsing errors enables die imperfect output of the parsing engine to be corrected. At the same time, the process is much more user friendly and less tedious for the user than if the user had been asked to enter each field that the address is divided into by the parsing engine separately. By having the parsing engine parse the address and present the result of the parsing to the user, tedium is minimized and accuracy is achieved.

If the applicant responds that the data and parsing is correct instead of editing the parsing of the data into the displayed fields in step **310**, then a step **311** transfers control to a step **312** where pre-credit bureau tests are run on the data. If the applicant edits the data, then control is transferred back to step **306** and the data is re-checked for validity. If the applicant fails the pre-credit bureau test, then the applicants status is changed to rejected in a step **313** and if the applicant passes the pre-credit bureau test, then the credit bureaus are accessed and credit bureau tests based on the data obtained from the credit bureau and other applicant data are performed in a step **314**. If the applicant passes the credit bureau tests, then post credit bureau tests are run in a step **316**. If the applicant passes the post credit bureau tests, then the applicant is accepted to receive an offer for credit and the approval process ends at **320**.

If the applicant fails the credit bureau tests, then the application status is changed to rejected in a step **315**. As

described below, an on line rejection process is executed for applications with a rejected status. Thus, the applicant information is input to a series of tests and the result of the tests determines whether the applicant is accepted or rejected.

FIG. 4A is a flow chart illustrating a validation process that is used in step **306** according to one embodiment of the invention. The Validator performs a plurality of validation tests on the applicant data. The process starts at **400**. In a step **402**, the applicant's address is validated according to an address validation test. In one embodiment, address validation includes checking that a street number and street name are entered and not a PO box. Next, in a step **404**, a validation status associated with the address validation test is stored in a test result object. In a step **406**, the applicant's phone number is validated according to a phone number validation test. The phone number validation test may include checking the number versus one or more tables or checking that an appropriate number of digits are provided. In a step **408**, a validation status associated with the phone number validation test is stored in a test result object. Finally, in a step **410**, the applicant's social security number is validated according to a social security number validation test. In a step **412**, a validation status associated with the social security number validation test is stored in a test result object and the process ends at **420**.

In this manner, the form of the data entered by the applicant is checked to determine whether the data entered is at least potentially correct. For example, if a social security number that does not exist for anyone is entered, it can be determined that the entered data must be invalid. In other embodiments, additional validation tests may be performed. Specifically, validation tests that help detect fraud may be implemented. In one embodiment, the validation status associated with each test result object includes a time stamp. Multiple applications with the same or similar names may be tracked and a history may be saved. Fraud tests may be implemented that track the number of applications submitted by a given individual and check the consistency of applicant data between multiple submitted applications.

FIG. 4B is a flow chart illustrating a process for parsing an address entered by an applicant. The process starts at **450**. In a step **452**, the address is split into fields using a parser. Next, In a step **454**, the parsing result is displayed. The applicant is prompted to indicate whether or not the parsing result is correct in a step **456**. If the result is not correct, then control is transferred to a step **458** and the applicant is allowed to change the fields assigned to each part of the data. Once the parsing is approved by the applicant, control is transferred to a step **460** and the parsed data is sent to the Underwriter. It should be noted that the data may also be sent through the validator again if the data was changed by the user. The process ends at **462**.

FIG. **5** is a flow chart illustrating a pre-credit bureau test performed in step **312** in one embodiment of the invention. Pre-credit bureau tests are performed prior to obtaining one or more credit reports for the applicant for the purpose of avoiding the expense of obtaining a credit report for certain applicants who would not be approved regardless of the content of the credit report. For an example, an applicant could be rejected based the applicant being of a minor age. In one embodiment, the pre-credit bureau test is performed by the Underwriter. In other embodiments, the pre-credit bureau test may be performed by the parsing engine or a separate module. The process starts at **500**. In a step **502**, the applicant's income is obtained. Next, at step **504**, it is determined if the applicant's income exceeds an annual income criteria. If the applicant does not meet the annual income criteria, the status of the application may be set to declined in a step **506**. By way of example, if the income entered by the applicant is less than $15,000, the status of the application may be set to declined. In a step **508**, the applicant's age is obtained. In a step **510**, the applicant is verified to meet a minimum age criteria. For example, the minimum age may be 18. If the applicant fails to meet the minimum age criteria, the application status may similarly be set to declined in a step **512**. It should be noted that the above description recites that age and income are checked in separate steps. Alternatively, they may be checked together.

If the applicant meets the minimum age and income requirements, then control is transferred to a step **514**. Step **514** checks whether the application entered is a duplicate application. If the applicant has previously entered the information in the application database, then the current application is a duplicate application. It is important to recognize such duplicate applications so that a single applicant cannot require multiple credit reports to be obtained. In one embodiment, duplicate applications are recognized by checking for duplicate social security numbers, duplicate names and/or duplicate addresses. In order to be rejected by the system, an application must match two of the three criteria. A rule is established that an applicant may reapply for a credit card after a specified time period has elapsed (e.g., 60 days). Such a rule is implemented in a step **516** that checks whether the application submission date exceeds a specified time period since the submission date of the found duplicate application. If the application is submitted prior to the specified time period, the status of the application is changed to duplicate in a step **518** and the process ends at **520**.

When a duplicate application is submitted, then the applicant is notified and a message is provided that informs the applicants that duplicate applications may not be submitted within a certain time period of each other. In addition, the applicant may also be prompted to go to a re-entry screen that allows the found duplicate application to be processed if processing of that application was previously interrupted. In this manner, if an applicant quit in the middle of the application process, then the application process can be completed for the previously submitted application.

It should be noted that a specific series of pre-credit bureau tests have been shown for the purpose of illustration. Other tests can be used within the scope of this invention. Also, it should be noted that if one test is failed, then remaining tests are skipped in some embodiments. Alternatively, all of the pre-credit bureau tests may be performed and the pre-credit bureau test results may be stored in separate question objects. This may help detect potentially fraudulent applicants who create many duplicates. If an application is determined potentially to be fraudulent, the status of the application is changed to fraud. Alternatively a separate flag may be set to indicate the potential fraud.

Once it is determined the applicant has entered data that is at least potentially valid and the applicant has approved the output of the parsing engine, the application is ready to be checked by the Underwriter to determine whether credit should be approved for the applicant. The Underwriter makes such a determination based on the information obtained from credit bureaus. Since the decision made by the Underwriter is made without human intervention, it is particularly important that the method of determination made by the Underwriter is reliable. For this reason, it is preferred that, in order for an applicant to be approved, at least two

credit bureaus must provide information about that applicant that passes a series of tests. In some embodiments, this rule may be relaxed, but a process that requires data from at least two credit bureaus for approval has been shown to have superior reliability to processes without such a requirement. In particular, it has been determined that requiring data from at least two credit bureaus for approval is an important factor in enabling the real time credit approval system to make sufficiently reliable determinations.

Because at least two credit reports from two different credit bureaus are required, it is possible that certain applicants may be rejected because they are only included in the records of a single credit bureau. When this occurs, that reason for rejection is given to the applicant instead of a reason based on the failure of the applicant to pass a test based on credit bureau data.

FIG. 6A is a flow chart illustrating a process for making an underwriting decision using multiple credit reports. The process starts at **600**. In a step **602**, a first credit bureau test is performed. The process of performing a test on individual credit bureau data is further described in FIG. 6B. If that test is failed, then the application is rejected in a step **604** and the process ends at **606**. Immediately rejecting the application after a first failure saves the cost of obtaining a second credit bureau report. If the first credit bureau test does not fail, either because no report is obtained or because the test is passed, then control is transferred to a step **608** and a second credit bureau test is performed. If that test is failed, then the application is rejected in step **604** and the process ends at **606**. If the second credit bureau test does not fail, then it is determined in a step **612** whether two credit bureau tests have been passed. If two tests have been passed, then the application is accepted in a step **614** and an offer is determined as described below.

If two credit bureau tests have not been passed, then control is transferred to a step **616** where it is determined whether one credit bureau test has been passed. If one credit bureau test has not been passed, then the application is rejected in a step **618** for not having a record in at least two credit bureaus. The third credit bureau is not checked since it is not possible to get at least two credit reports at that point. If one credit bureau test has been passed, then a third credit bureau is consulted in a step **620**. If the third credit bureau test is failed, then the application is rejected in a step **622** and the process ends at **606**. If the third credit bureau report does not have a record for the applicant, then the application is rejected in step **618** for not having enough credit records and the process ends at **606**. If the third credit bureau test is passed, then the application is accepted in a step **624** and the process ends at **606**.

Thus, the Underwriter only accepts applications that pass at least two credit bureau tests. It should be noted that a special reason for rejection may be given to applicants who are rejected because they do not have a record in at least two credit bureaus. Also, it should be noted that in some embodiments, it is distinguished whether a credit report is not obtained because a credit bureau is temporarily unavailable or whether a credit report is not obtained because there is no record for the applicant. In the event that a credit bureau is unavailable, an applicant that cannot be found in the remaining two credit bureaus may be given a special rejection notice indicating that a later attempt should be made by the applicant when the unavailable credit bureau is functioning. Also, when two credit bureaus are unavailable at the same time, all applicants may be requested to reapply when the credit bureaus return on line.

FIG. 6B is a flow chart illustrating a process implemented on the Underwriter for using credit bureau data to accept or reject an applicant in one embodiment. The process starts at **650**. In a step **652**, a credit report is requested from the credit bureau. As described above, the credit report can be requested using data entered directly by the applicant because the parsing engine classifies the data into appropriate fields to be sent to the credit bureau. Once the report is received, the Underwriter performs tests on the data in the credit report. Data entered by the applicant may be used for Underwriter tests as well. In a step **656**, a set of attribute tests are performed using the credit report. Attribute tests are general tests that may be applied to any credit report. Each attribute test corresponds to a general attribute provided in the credit report. Attribute tests may include threshold tests, which compare certain parameters such as a FICO score to a threshold, or logical tests, which check for the existence of certain adverse records. Next, in a step **658**, a set of credit report specific tests are performed using the credit report. A set of credit report specific tests may be defined for each credit bureau. Each credit report specific test corresponds to data that is specific to a particular credit bureau.

The credit bureau tests may be separately performed to avoid performing the remaining tests once the failure of the application to pass a test results in a determination that the application will be declined. However, each of the set of attribute tests and credit report specific tests are preferably performed so that the best basis for rejection may be identified and provided to the applicant. Determining an appropriate basis of rejection to display to the applicant is described further below in connection with FIG. 7. It is determined in a step **660** whether the applicant passed the credit tests and the application is rejected in a step **662** if the applicant failed the tests. If the applicant passes the tests, that is noted in a step **664** for the purpose of determining whether the applicant should be accepted as described in FIG. 6A. The process then ends at **670**.

As described above, the process of performing the various tests may generally be considered as performing various attribute tests and credit specific tests and combining the results of those tests in some fashion to make a decision to pass or fail an applicant.

FIG. 6C is a flow chart illustrating a process for using the FICO score combined with other attributes to accept or reject an applicant. The process starts at **680**. In a step **682**, the FICO score is checked. If the FICO score is below a rejection threshold, then the application is rejected in a step **684**. If the FICO score is above an acceptance threshold, then control is transferred to a step **688** and other attributes are checked. If any attribute tests are failed, then control is transferred to step **688** by a step **690** and the application is rejected. If all attribute tests are passed, then control is transferred to a step **692** and the application is accepted. The process ends at **694**.

It should be noted that in other embodiments, other methods of determining whether to accept or reject an applicant are used. For example, in one embodiment, an applicant is accepted automatically if he or she has a FICO score that is above a certain threshold.

The attribute tests performed in step **688** may take on various forms. In one embodiment, a list of attributes is checked including attributes such as whether the applicant is severely delinquent, currently delinquent, has a derogatory public record, or has been delinquent a certain number of times in a past period. A test may be defined for each attribute such as a maximum number of times delinquent above which the test is failed. In one embodiment, a list of tests is defined and all of the tests must be passed. In another

embodiment, a list of tests is defined and certain subsets of the list are also defined. At least one subset must be passed for the applicant to pass.

Once the decision is made to accept or reject an applicant, the status of the applicant is set to be accepted or rejected. Rejected applications are processed in a rejection process described in FIG. 7. Accepted applications are processed in an offer and confirmation process described in FIG. 10A.

FIG. 7 is a flow chart illustrating a process for checking the status of an application and executing either an offer process or one of several rejection processes. The process starts at **700**. In a step **702**, the status of the application is checked based on the processing performed by the Underwriter. As mentioned above, the Underwriter determines whether the application is a duplicate application, whether enough credit bureaus are available to provide sufficient credit reports to evaluate the application, and whether applications having sufficient credit reports should be accepted or rejected.

If the status of the application determined by the Underwriter is that the application is a duplicate of a previously entered application, then control is transferred to a step **706** and a message indicating that the application is a duplicate is displayed to the applicant. Next, in a step **708**, a link to a reentry screen is provided to the applicant. The reentry screen allows the applicant to execute a process that finds the earlier application and allows the applicant to review or resume the earlier application. For example, if the earlier application was accepted but the applicant did not accept an offer, then the process may resume at that point and the applicant may be given another opportunity to accept. This is preferable to allowing the application process to be repeated from the beginning since that could needlessly cause a new credit report to be obtained. After the reentry screen is displayed, the process ends at **720**.

If the status of the application indicates that the application has been accepted, then control is transferred to a step **714** and an offer process is executed. The offer process is described in further detail in FIG. **10**. If the status of the application is that a credit bureau error occurred, then control is transferred to a step **710** and an error message is displayed indicating that not enough credit bureaus are currently available to allow the application to be processed. Also, in a step **712**, a link is provided to a site that allows the applicant to report the error and request further information or request to be contacted. After the offer process or the credit bureau error process is executed, the process ends at **720**.

If the status of the application indicates that the application has been rejected, then control is transferred to a step **704** and a rejection process is executed. The rejection process is described in further detail in FIG. 8A and FIG. 8B. Once the rejection process is executed, the process ends at **720**.

FIG. 8A is a flow chart illustrating a process for determining an appropriate reason to display for rejecting an applicant and displaying that reason. The process starts at **800**. In a step **802**, the main factors given by the credit bureau that affect the FICO score are obtained. Generally, the main factors identified by the credit bureau for the FICO score are provided in the form of a numerical code that corresponds to a predetermined factor. In a step **804**, the credit bureau code is mapped to an internal code that is determined from a data structure that maps bureau codes to internal factors. In one embodiment, the data structure is a table such as that illustrated in FIG. 8B.

Certain credit bureau codes that indicate positive factors that would be inappropriate bases for rejection such as home ownership are mapped by the data structure to a general rejection reason such as "Applicant rejected based on FICO score" or "Applicant rejected based on credit bureau data." Although such general reasons may be provided to the applicant as a last resort, it is preferred that a more specific reason be given. To that end, a step **806** checks whether any of the FICO reasons have been mapped to any specific rejection reasons. If all of the FICO reasons map only to the general reason, then control is transferred to a step **808**.

In step **808**, the rejection process begins to attempt to find a more appropriate reason for rejection of the applicant. First, the results of the various attribute tests generated by the Underwriter are obtained. In a step **810**, it is checked whether any of the attribute test results map to an appropriate rejection reason. If an attribute test result maps to an appropriate reason, then control is transferred to a step **812** and the attribute reason is assigned as the reason given to the applicant upon rejection. If the attribute test does not map to an appropriate reason, then control is transferred to a step **816** and a general reason is assigned as the reason given to the applicant upon rejection. If, in step **806**, it was determined that one or more of the FICO score factors identified by the credit bureau correspond to an acceptable rejection reason other than the general rejection reason, then that reason is assigned as the reason to be given to the applicant in a step **814**. Whether or not a specific reason is identified by the above mentioned steps, control is transferred to a step **818** where the reason is displayed to the applicant and the process then ends at **820**.

FIG. **8B** is a diagram illustrating one data structure used to map main FICO factors provided by the credit bureau (referred to as external codes) to internal decline codes as well as reasons for rejection to be provided to rejected applicants. It should be noted that although a table is shown, other data structures such as a linked list are used in other embodiments. Each external code maps to an internal code that corresponds to an internal reason for rejecting the applicant. The actual reason is also stored for each internal code. As described above, certain external codes correspond to internal codes that provide only a general rejection reason. Other external codes are mapped to internal codes that allow a specific rejection reason to be given.

Once an appropriate rejection reason is selected, it is necessary to display the reason to the applicant. In one embodiment, the reason is displayed on a web page along with an acknowledgement button that allows the applicant to acknowledge that he or she has read the rejection message. FIG. **9** is a flow chart illustrating how a rejection reason may be obtained. The process starts at **900**. In a step **902**, the reason for rejection is retrieved. Next, in a step **904**, the rejection reason is displayed. In addition, in a step **906**, a link to a credit counseling site is also displayed. The acknowledgement button is displayed in a step **908**. When the applicant leaves the rejection page, a step **910** checks whether the acknowledgement button has been activated. If the button has been activated, then control is transferred to a step **912** where the application is marked as having had an acknowledgement to a rejection. If the acknowledgement button has not been activated, then control is transferred to a step **914** and the application is marked as not having had an acknowledgement to a rejection. The process ends at **916**.

It should be noted that other methods of verifying that a rejection has been received are used in other embodiments. For example, in one embodiment, an applet is sent along with the rejection that sends a message back to the credit

approval system when the rejection message page is completely downloaded by the applicant. In this manner, the fact that a rejection was delivered to the applicant can be verified without requiring any action by the applicant.

Once the rejection has been sent and acknowledged or not, the rejection or acknowledgement status may be provided to an entity such as FDR for the purpose of generating hard copies of rejection letters and either sending such hard copies as confirmations to all rejected applicants or else, in some embodiments, only sending hard copies of rejection letters to applicants that have not acknowledged an on line rejection.

Accepted applications have an accepted status and they also contain important applicant information supplied by the applicant and obtained from the credit bureau reports that can be used to design a custom account level offer for the applicant. Preferably, multiple offers are presented to the applicant, allowing the applicant to select an offer that includes terms that the applicant desires to accept.

FIG. 10A is a flowchart illustrating a process for providing a set of multiple offers to an applicant and receiving a balance transfer amount corresponding to an offer selected by the applicant. The process starts at **1000**. In the step **1002**, the application object is retrieved. The application object includes the information provided by the applicant as well as information obtained from credit bureaus and analyzed by the Underwriter.

Next, in a step **1004**, offer selection criteria are obtained from the credit report object. In one embodiment, the offer selection criteria include FICO score, income and a balance transfer requirement. Offer selection criteria also may include data entered by the applicant. The offer selection criteria also may include other attributes such as time on file. In general, the offer selection criteria are selected from information obtained from the applicant and from the credit bureaus for the purpose of estimating the applicants risk of default to determine an expectation of future loss as well as an expected future total revolving balance (TRB). In this manner, an appropriate offer may be determined. In one embodiment, the balance transfer requirement is calculated as a selected percentage of the applicant's TRB. As described below, different offer terms may be provided for different balance transfer requirements. As noted above, in other embodiments, other data structures than the application object are used to store this information.

Next, in a step **1006**, a set of offers is derived from the credit report data and other applicant information stored in the application object. In a step **1008**, the set of offers is displayed. In one embodiment, the offers are derived from the FICO score and income of the applicant, which determine the risk of default, and also from a balance transfer amount specified in the offer. The balance transfer amount may be determined as a percentage of the total revolving balance that the applicant has on all outstanding credit cards in the credit report for the applicant. Both the credit limit offered to the applicant and the interest rate offered to the applicant may vary according to the amount of the total revolving balance that the applicant chooses to transfer to the new account.

In addition offers may present incentives such as frequent flier miles, cash back on purchases, or favorable interest rates.

In a step **1010**, the system notes the selected offer and balance transfer amount. Next, in a step **1012**, the system obtains the balance transfer amount from the applicant. Preferably, the balance transfer is actually executed while the applicant is on line. The process for obtaining and executing the balance transfer in real time on line is described further in FIG. 13. Once the balance transfer is executed, a data file is assembled for transmission to FDR for the purpose of issuing a credit card in a step **1014**. The process ends at **1016**. Thus, the system derives a set of offers based on information from the applicant's credit reports and displays the set of offers to the applicant. The applicant then can select an offer based on the amount of balance transfer that the applicant wishes to make. Once the applicant selects an offer and a balance transfer amount, the system actually executes the balance transfer by allowing the applicant to select the accounts from which to transfer balances. Once the balance transfer is executed, the data relating the application is assembled and sent to FDR.

In different embodiments, the system uses different methods of determining the terms of the offer extended to the applicant based on the information derived from the credit report. FIG. **10B** is a flow chart illustrating one such method of deriving a credit limit for an applicant based on the applicant's FICO score and income, as well as the amount of total revolving balance that the applicant elects to transfer. The process starts at **1020**. In a step **1022**, the system obtains applicant information and the credit bureau information. This information may include the FICO score and income of the applicant. Next, applicant information and the credit bureau information are used to determine an expected unit loss rate for the applicant In a step **1024**. The unit loss rate corresponds to the probability that the applicant will default on the credit line extended. That probability multiplied by the credit limit extended to the applicant determines the dollar loss rate for that applicant. The dollar loss rate divided by the average total outstanding balance of the account is the dollar charge off rate for the applicant.

In one embodiment it is desired that a dollar charge off rate be kept within a determined range for different applicants. To accomplish this, it is desirable to extend smaller amounts of credit to applicants with a higher probability of defaulting. It is also useful to extend different amounts of credit based on a total outstanding balance transferred by the applicant since the balance transfer influences the likely future total outstanding balance of the account. Conventional offer systems have been able to extend offers to applicants with credit limits that are controlled by the applicant's predicted average dollar loss. However, prior systems have not been able to extend credit and determine a credit limit based on a predicted total outstanding balance for the client because they have failed to be able to present offers and condition the acceptance of the offers in real-time on a balance transfer made by the applicant.

Next, in a step **1026** the system determines one or more balance transfer amounts based on the total revolving balance that the applicant has in various other credit card accounts. In one embodiment, the balance transfer amounts are calculated based on different percentages of the total revolving balance determined from all of the applicant's accounts found in the credit report. Then, in a step **1028**, the system calculates for each total balance transfer amount choice that will be presented to the applicant, a predicted estimated revolving balance for the future that the applicant would be expected to maintain. The estimated total revolving balance may be equal to the balance transfer amount or may be a function of the balance transfer amount. In one embodiment, the estimated total revolving balance does not depend on the balance transfer amount. In one embodiment, four possible percentages of the applicant's total revolving balance as determined by the credit report are presented to

the applicant. Those choices are none of the balance, one-third of the balance, two-thirds of the balance, and the full balance. Depending on which of those amounts is selected by the applicant, the system calculates a predicted total revolving balance for the future. Then, in a step **1030**, the credit limit for the applicant is set to achieve a target dollar charge off rate based on the amount of the total revolving balance that the applicant elects to transfer and the risk of default. The process then ends at **1032**.

The process described in FIG. **10B** shows conceptually how a credit limit could be determined based on an amount of balance transfer and a FICO score and income. This process may be implemented directly in some embodiments. However, in other embodiments, it is preferred that a table be precalculated that includes amounts of credit limit that the applicant will be given based on certain amounts of balance transfer and FICO score. Using such a table, the applicant's FICO score and balance transfer amount may be looked up and then the credit limit may be found in the corresponding cell. FIG. **10C** is a table illustrating how this is accomplished. Each row of the table corresponds to a different FICO score, and each column of the table corresponds to a different balance transfer amount. When the cell corresponding to the FICO score and balance transfer amount is determined, the credit limit obtained. A cut-off line **1040** is also shown which represents an upper limit for a balance transfers for a given FICO score.

In the embodiment described above, separate tables are prepared for applicants of different incomes. In addition, separate tables may also be prepared for applicants having other different characteristics such as time on file for the applicant. It should be noted that the tabular representation of the data is presented as an example only and the data may be represented in many ways including in three-dimensional or four-dimensional arrays, linked lists or other data representations optimized for a particular system. By allowing the account credit limit to be a function of FICO score, balance transfer, and income, a credit limit may be selected for each individual account that enables the dollar charge off rate for all applicants to be controlled.

FIG. **11** is another data representation illustrating another embodiment of how the offers may be determined based on FICO score, income range, income, and total revolving balance transfer. A single table includes a range of FICO scores **1108**, an income range **1110**, a balance transfer column **1112**, and four offer columns, **1114**, **1116**, **1118**, and **1120**. Each of the offer columns includes a link to a web page that describes the offer in more detail. Once the proper row of the table is found, multiple offers may be displayed to the applicant by assembling the various links either in a single frame or in consecutive frames for the applicant to view and select an offer.

Another component of the offer granted to the applicant that may be varied based on the balance transfer selected is a teaser rate or annual rate. A teaser rate is an interest rate that is temporarily extended to the applicant either on the amount transferred or on the amount transferred and purchases made for a certain period of time. The teaser rate is intended to incent the applicant to transfer a greater balance to a new account In one embodiment, the teaser rate is determined based on the percentage of the applicant's total revolving balance that the applicant elects to transfer. Thus, the amount transferred by the applicant controls not only the applicant's credit limit but also determines a teaser rate extended to the applicant.

FIG. **12** is a diagram illustrating a display provided to the applicant for the purpose of presenting multiple offers to the applicant. The display includes a first offer **1204**, a second offer **1206**, a third offer **1208**, and a fourth offer **1210**. For each offer, there is a column **1214** corresponding to the initial teaser rate, a column **1216** corresponding to the annual fee offer, a column **1218** corresponding to the credit limit, and a column **1220** corresponding to the required balance transfer for that offer to be accepted. The applicant selects one of the offers from the table. As noted above, in one embodiment, the offers are provided as part of a web page and the offers are presented using html. By selecting an offer, the applicant selects a link that indicates to the system which offer is selected. Once an offer is selected, the process of acquiring the required balance transfer in real-time from the applicant is executed. That process is described further in FIG. 13.

FIG. **13** is a flow chart illustrating a process for obtaining a real-time balance transfer from an applicant. The process starts at **1300**. In a step **1302**, the system retrieves the accounts and balances that the applicant has based on the credit report data obtained for the applicant. Next, in a step **1304**, the estimated balances for each of the accounts that were retrieved in step **1302** are presented to the applicant and the accounts are identified. Identification of the accounts is a sensitive issue because the specific account data for the applicant is confidential and if the information is displayed to an unauthorized person, fraud could result. Therefore, in one embodiment, a partial account number that lists the account granting institution as well as part of the account number for the account held by the applicant with that institution is displayed. Generally, this information is sufficient for the applicant to recognize the account, but is not enough information to present a fraud risk.

It should be noted that in some embodiments, the accounts chosen for display by the underwriter are selected in a manner to facilitate a simpler balance transfer. For example, the largest account balances may be displayed first so that amounts may be efficiently transferred to meet the required transfer. Also, a group of balances to transfer may be presented to the applicant by highlighting certain accounts.

Next, the applicant is given an opportunity to indicate a balance transfer by selecting one of the accounts and indicating the amount to be transferred. It should be noted that the applicant in this manner does not need to provide account information to execute a balance transfer. If a transfer is indicated, control is transferred to a step **1306** and the amount of the user balance transfer is obtained. Next, in a step **1307**, it is determined whether the sum of the balance transfers is greater than or equal to the required transfer amounts for the offer selected by the applicant. If the amount is not greater than or equal to the required-transferred amount, then control is transferred back to step **1304** and the applicant is given an opportunity to select further balances to transfer. If the amount of the balance transfers is greater than or equal to a required transfer amount, then control is transferred to a step **1308** and the system requests final confirmation from the applicant of the balance transfers. If it is determined in a step **1310** that a confirmation of the balance transfer has been received, then control is transferred to a step **1312** and the balance transfers are executed. The process ends at **1314**.

If in step **1304**, it is determined that the applicant has elected to exit the balance transfer screen instead of indicating a balance transfer, or if it is determined in step **1310** that the applicant elects not to confirm the balance transfer amounts selected, then control is transferred to a step **1316** and the applicant is returned to the offer selection screen so that the applicant will have an opportunity to select another

offer that either does not require a balance transfer or requires less of a balance transfer. The process then ends at **1314**.

FIG. **14** is a block diagram illustrating one computer network scheme that may be used to implement the system described herein. An applicant host system **1402** is connected to the Internet **1404**. The applicant host system may be a PC, a network computer, or any type of system that is able to transmit and receive information over the Internet. Also, in other embodiments, a private network such as a LAN or WAN or a dedicated network may be used by the applicant to communicate. A web server **1406** is also connected to the Internet and communicates with the applicant host system via the Internet to request and receive applicant information and to notify the applicant of the results of the approval process. Web server **1406** in one embodiment accesses a business logic server **1408** that implements the various approval checking processes described herein. It should be noted that in some embodiments, the web server and the business logic server are implemented on a single computer system with one microprocessor. However, for the sake of efficiency, the system implemented as shown is often used with different servers dedicated to communicating with applicants and processing applicant data, respectively. The business logic server, wherever implemented, includes a communication line on which communication may be had with credit bureaus or other outside data sources. In some embodiments, an Internet connection may be used for that purpose. Thus applicant data is obtained by the business logic server either over the Internet either directly or through a Web server. Also, data may be obtained by the business logic server from an applicant using a direct dial in connection or some other type of network connection.

A real time credit approval system has been described herein primarily for the purpose of determining whether a credit card should be issued to an applicant. Software written to implement the system may be stored in some form of computer-readable medium, such as memory or CD-ROM, or transmitted over a network via a carrier wave in the form of Java® applets, other forms of applets or servlets, and executed by a processor. The system may be implemented on a PC or other general purpose computer known in the computer art.

It should be recognized that the system described may also be used for the purpose of granting credit to an applicant for the purpose of making a single transaction. In such a system, a transaction is interrupted and the application for credit is made. Based on the real time approval decision made, credit may or may not be granted for the purpose of completing the transaction.

Although the foregoing invention has been described in some detail for purposes of clarity of understanding, it will be apparent that certain changes and modifications may be practiced within the scope of the appended claims. It should be noted that there are many alternative ways of implementing both the process and apparatus of the present invention. Accordingly, the present embodiments are to be considered as illustrative and not restrictive, and the invention is not to be limited to the details given herein, but may be modified within the scope and equivalents of the appended claims.

What is claimed is:

1. A method for providing real time approval of credit over a network, comprising:

obtaining applicant data from an applicant;

determining whether to continue to process, or reject, the applicant based on the applicant data prior to obtaining a credit report from a credit bureau for the applicant, said step of determining whether to continue to process comprising:

checking based on the applicant data entered by the applicant and prior to obtaining a credit report whether the applicant data is a duplicate of applicant data previously entered by the applicant; and

permitting the applicant, in the event it is determined that the applicant data is a duplicate of applicant data previously entered by the applicant, to re-apply using the current applicant data only if the previously entered applicant data predates a duplication cutoff date; and

in the event it is determined based on the applicant data to process the applicant:

processing the applicant data into a form suitable for directly obtaining a credit report from a credit bureau for the applicant;

obtaining a credit report having credit report data from a credit bureau for the applicant;

determining whether to accept or reject the applicant using the credit report data; and

if it is determined to accept the applicant, communicating to the applicant that the applicant has been approved.

2. A system for providing real time approval of credit over a network implemented on one or more computer processors, comprising:

an application engine configured to obtain applicant data from an applicant;

an address parser configured to analyze the applicant data into a form suitable for directly obtaining a credit report from a credit bureau for the applicant; and

an underwriter configured to:

determine whether to continue to process, or reject, the applicant based on the applicant data prior to obtaining a credit report from a credit bureau for the applicant, said step of determining whether to continue to process comprising:

checking based on the applicant data entered by the applicant and prior to obtaining a credit report whether the applicant data is a duplicate of applicant data previously entered by the applicant; and

permitting the applicant, in the event it is determined that the applicant data is a duplicate of applicant data previously entered by the applicant, to re-apply using the current applicant data only if the previously entered applicant data predates a duplication cutoff date; and

in the event it is determined based on the applicant data to process the applicant, to obtain a credit report having credit report data from a credit bureau for the applicant, determine whether to accept the applicant using the credit report data and, if it is determined to accept the applicant, communicate to the applicant that the applicant has been approved.

3. A computer program for providing real time approval of credit over a network embodied on a carrier wave, comprising:

program code operative to obtain applicant data from an applicant;

program code operative to analyze the applicant data into a form suitable for directly obtaining a credit report from a credit bureau for the applicant;

program code operative to determine whether to continue to process, or reject, the applicant based on the appli-

cant data prior to obtaining a credit report from a credit bureau for the applicant, said program code operative to determine whether to continue to process comprising program code operative to check based on the applicant data entered by the applicant and prior to obtaining a credit report whether the applicant data is a duplicate of applicant data previously entered by the applicant and permit the applicant, in the event it is determined that the applicant data is a duplicate of applicant data previously entered by the applicant, to re-apply using the current applicant data only if the previously entered applicant data predates a duplication cutoff date;

program code operative to obtain a credit report having credit report data from a credit bureau for the applicant in the event it is determined based on the applicant data to process the applicant;

program code operative to determine whether to accept the applicant using the credit report data; and

program code operative to communicate to the applicant whether the applicant has been approved.

4. A computer readable medium having program code embodied therein for providing real time approval of credit over a network, comprising:

program code operative to obtain applicant data from an applicant;

program code operative to analyze the applicant data into a form suitable for directly obtaining a credit report from a credit bureau for the applicant;

program code operative to determine whether to continue to process, or reject, the applicant based on the applicant data prior to obtaining a credit report from a credit bureau for the applicant, said program code operative to determine whether to continue to process comprising program code operative to check based on the applicant data entered by the applicant and prior to obtaining a credit report whether the applicant data is a duplicate of applicant data previously entered by the applicant and permit the applicant, in the event it is determined that the applicant data is a duplicate of applicant data previously entered by the applicant, to re-apply using the current applicant data only if the previously entered applicant data predates a duplication cutoff date;

program code operative to obtain a credit report having credit report data from a credit bureau for the applicant in the event it is determined based on the applicant data to process the applicant;

program code operative to determine whether to accept the applicant using the credit report data; and

program code operative to communicate to the applicant whether the applicant has been approved.

* * * * *